United States Courts
Southern District of Texas
F I L E D

SEP 19 2019

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| Kashmir Khalistan Referendum Front "KKRF" a non profit organization; ) | |
| ) | **Civ. No.**_____ |
| Ms. TFK; an individual[1] ) | |
| ) | **COMPLAINT** |
| Mr. SMS, an individual[2] ) | |
| ) | |
| for themselves and ) their detained, disappeared, tortured and deceased ) relatives, left presently unnamed ) | **CLASS ACTION** |
| ) | |
| **Plaintiffs,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| v. ) | |
| ) | |
| Narendra MODI, ) a national of India and ) Prime Minister of India ) | |
| ) | |
| Amit SHAH, ) a national of India ) and Union Home Minister of India ) | |
| ) | |
| ) | |
| Kanwal Jeet Singh DHILLON ) Lt. General of Indian Army, ) Commander of Indian Forces in Indian occupied ) Kashmir ) | |
| ) | |
| **Defendants** ) | |

The Plaintiffs, allege the following:

## I.  PRELIMINARY STATEMENT

---

[1 & 2] The Plaintiffs "TFK" and "SMS" are natural persons, individuals and residents of the United States who are withholding their complete names at this stage of the proceedings owing to well-founded fear of retaliation from the state and non-state actors against their family members residing in India. Acting under the acronyms, the Plaintiffs affirm their statements and narrative provided in this complaint and plaintiffs will be available for in person and in camera appearance before the court to testify, if and when required by this court.

1. On August 5, 2019, the Indian government, headed by the defendant Narendra Modi with the active cooperation of the defendant Amit Shah illegally, unilaterally and in violation of international law annexed the region of Jammu and Kashmir which had been under the occupation of India since 1947.

2. Since then, through defendant Kanwal Jeet Singh Dhillon, defendants Modi and Shah have enforced a complete and violent clamp down[3] which includes, curfew, complete communication lock down, depravity of basic necessities to the inhabitants, illegal detentions, enforced disappearances, torture and extra judicial killings[4].

3. September 14, 2019 news published by the Associated Press reports the situation in Kashmir under defendants' control, as:

> "Dar's account of violence and intimidation by Indian soldiers was not unusual. In more than 50 interviews, residents in a dozen villages in Kashmir told The Associated Press that the military had raided their homes since India's government imposed a security crackdown in the region on Aug. 5. They said the soldiers inflicted beatings and electric shocks, forced them to eat dirt or drink filthy water, poisoned their food supplies or killed livestock, and threatened to take away and marry their female relatives. Thousands of young men have been arrested".
>
> *See* AP Sept 14 report "*Kashmiris allege night terror by Indian troops in crackdown*" at:
>
> https://www.apnews.com/52b06a124a5a4469984793d3c208733d

---

[3] *See* August 15th report by The Economist "In its struggle to subdue Kashmir, India is stripping it of liberties" https://www.economist.com/asia/2019/08/15/in-its-struggle-to-subdue-kashmir-india-is-stripping-it-of-liberties
[4] *See* AFP report dated Sept 10, 2019 "Kashmir families allege brutality by Indian forces" https://news.yahoo.com/kashmir-families-allege-brutality-indian-forces-085243984.html

4.   In addition to already deployed 700,000 Indian Army in the Indian occupied Jammu & Kashmir region Defendant Modi and Shah deployed additional 35,000 troops under the command of defendant Dhillon. Indian forces have been committing human rights violations including extra judicial killings, torture, raping women and shooting children with pellet guns. However, since August 5, 2019, on the orders and directions of defendant Modi and Shah, defendant Dhillon has heightened the human rights violations and caused a grave humanitarian crisis[5] amounting to looming danger of genocide of the Kashmiri people at the hands of Indian government.

5.   Defendant Modi and Shah both are leaders of ruling party of India, the Bhartiya Janata Party (BJP) which is a Hindu supremacist party. Since the annexation of Jammu and Kashmir, leaders of BJP have given a call to the party workers to go to Kashmir to get "fair skinned Kashmiri girls"[6] indicating mass scale violence against Kashmiri women.

6.   Since August 5, 2019, seven (7) million people of Indian occupied Jammu and Kashmir are living under curfew, cut from the rest of the world, living in sub human conditions. Even emergency medical services have been locked down turning the hospitals into graveyards[7].

7.   Indian occupied Kashmir is the only region of India with majority Muslim population and the defendants Modi and Shah's have a track record of anti-Muslim sentiments and actions. In 2002, defendants Modi and Shah through the actions and inactions, provoked,

---

[5] *See* August 7th report by Telegraph UK, "Kashmir residents say they are starving as first accounts of India's lock-down of region emerge"
https://www.telegraph.co.uk/news/2019/08/07/kashmir-residents-say-starving-first-accounts-surface-lock-down/
[6] *See* August 8th report by Reuters: "Indian men who see new policy as chance to marry Kashmir women accused of chauvinism" https://www.reuters.com/article/us-india-kashmir-women/indian-men-who-see-new-policy-as-chance-to-marry-kashmiri-women-accused-of-chauvinism-idUSKCN1UY104

[7]*See* August 28 report by *Wall Street Journal* "India's Kashmir Clampdown Turns Hospitals Into 'Graveyards'"
https://www.wsj.com/articles/indias-kashmir-clampdown-turns-hospitals-into-graveyards-11566990962

instigated, facilitated, condoned and actively covered up the mass killings and violence against the Muslim community in the state of Gujarat where defendant Modi was Chief Minister at that time.

8.  Since becoming Prime Minister in 2014 and being re-elected in 2019, the police and government agents under defendants Modi and Shah are persecuting people not belonging to Hindu faith particularly Muslims, Sikhs and Christians. There is evidence to support the conclusion that Modi and Shah committed both acts of intentional and malicious direction to officials in India to kill and maim innocent persons of the Muslim faith but also acted negligently in failing to consider the rights and principles of all the people of India, not just those who worship the mainstream religion - Hinduism.

9.  There is evidence that Modi and Shah acting in conjunction through defendant Dhillon planned and perpetrated currently ongoing genocidal violence against the life, liberty and property of Muslims of Indian occupied Kashmir.

10. It is known that Defendants Modi and Shah have been members and functionaries of the Rashtriya Swayamsevak Sangh (RSS), a Hindu supremacist party motivated by Nazi and fascist ideologies. Defendants incorporated such ideals in running of the government of India.

11. Consequently, the Defendants are responsible for the extra judicial killing of thousands of people, rape of women[8], torture and enforced disappearance of the people of Jammu and Kashmir.

---

[8] *See* Aug 21st report by Aljazeera: "Kashmir women are the biggest victims of this inhumane siege - Sense of fear deepens as Indian politicians stoke misogyny with talk of freedom to marry 'white-skinned' Kashmiri women" https://www.aljazeera.com/indepth/features/women-biggest-victims-inhumane-siege-190820122327902.html

12. The actions of defendants, individually and collective amount to attempted genocide[9] and that justice for the Plaintiffs cannot be achieved in India because of the long standing practice of impunity at the state and governmental level in India.

13. The Plaintiffs are those who are either personally injured or had immediate family members who were injured or killed as a result of the onslaught that resulted from this unspeakable cruelty perpetrated by the defendants since and before August 05, 2019 in Jammu and Kashmir region.

14. This is a civil action for compensatory and punitive damages against Defendants Modi, Shah and Dhillon for violations of state, federal, and international law committed against the people of Jammu and Kashmir, specifically Plaintiffs and their respective families.

15. Plaintiff class leaders will testify and produce sworn statements to be filed under seal for the security and safety of both themselves and their other family members still residing in India and subject to the pressures of the local law enforcement controlled and commanded by the Defendants[10]. These sworn statements would be made available for "in-camera" inspection by this honorable Court. These sworn statements would show the horrors that these Plaintiffs have suffered and that their deceased loved ones have suffered at the hands of the state government run and controlled by the Defendants. They will show how the Plaintiffs and their families directly and substantially suffered bodily, property, psychological, emotional and mental injuries since and before August 05, 2019

---

[9] "[G]enocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; (d) Imposing measures intended to prevent births within the group; (e) Forcibly transferring children of the group to another group."[*See* (Article 2 of the UN Convention on the Prevention and Punishment of Genocide; 18 U.S.C. § 1091(a)(c)(d)]

[10] *See* Aug 8th report by AP "No phone calls, no groceries: Kashmir on edge under lockdown" https://apnews.com/9491eada41bf49d184d4fac5f7d7794a?fbclid=IwAR2DphKi9U0ZptkmDSSb39fgmuS-Lia6FS2J8CYR1mbh3h2HMqaCQcwSWKQ

as a result of the violence that was ordered, aided, abetted, directed, facilitated and connived by the Defendants Modi and Shah and carried out by the forces under the command of defendant Dhillon.

## II. PARTIES

### A. Plaintiffs

16. The Plaintiff "Kashmir Khalistan Referendum Front" (KKRF) is a community based non-profit organization registered in the United States with the objective of promoting and advocating right of self-determination under international law for the people of Kashmir and Punjab through holding referendum and to highlight the human rights violations committed by the Government of India against people of Kashmir and Punjab for peacefully demanding self-determination.

17. Plaintiff Ms. TFK, is an individual, natural person, female of Kashmiri descent and resident of the United States. Plaintiff had a sister living in Srinagar Kashmir who died in September 2019. Due to the brutal curfew and clampdown ordered by the Defendant Modi and Shah and carried out and enforced by defendant Dhillon, Plaintiff's sister who was aged was deprived of necessary lifesaving medicine, treatment and care which directly caused her demise. Plaintiff suffered the mental suffering herself owing to the physical suffering and wrongful death of her sister due to the actions of the defendants.

18. Plaintiff "SMS" is an individual, natural person of Kashmiri descent, residing in the United States whose immediate family has been severely and adversely harmed by the actions of defendants since August 05, 2019. Plaintiff SMS's immediately family resides in Indian Occupied Kashmir.

On the morning of August 5th 2019, the Indian military garrisoned the plaintiff's family home in Srinagar Kashmir, beat up, detained and abducted his father without warrants and charges. Plaintiff's father is a civilian with no political affiliation and no criminal background. Since then, the whereabouts of the plaintiff's father are unknown as he has been subjected to enforced disappearance.

19. Plaintiff SMS's father has been subjected to "Enforced Disappearance" by the Indian forces acting under the command of Defendant Dhillon who in turn is following the policy laid down by the Defendants Modi and Shah since August 05, 2019. At the time of abduction and enforced disappearance by the Indian Army, plaintiff's father was seriously ill and was suffering from infection which needed immediate surgery. All the efforts of plaintiff's mother to locate her husband in India have been futile and stone walled by the Indian officials who refuse to even acknowledge her husband's detention let alone disclose his place of detention or charges.

20. Based on the established practice and pattern of Indian government, the plaintiff strongly fears that Indian Government headed by Modi might have caused serious or fatal harm to his father. Plaintiff has since then been suffering mental distress and harm himself due to the enforced disappearance and the fear of the wrongful death of his father at the hands of the defendants.

**B. Defendant:**

21. Defendant Narendra Modi in a national and citizen of India and is the Prime Minister of the India since 2014. He presided over, initiated, and condoned the acts mentioned above in Jammu and Kashmir and that form the factual basis of this complaint. The defendant will be physically present in the United States from September 21, 2019 till about

September 29 and will be present in Houston on 21st and 22nd of September, 2019 when he will address a public gathering at NRG Stadium, Houston.

22. Defendant is also a member and the leader of Bhartiya Janata Party (BJP) and member of Rashtriya Swayamsevak Sangh (RSS), as well as maintains association with Vishva Hindu Parishad (VHP) and Bajrang Dal (BD), supremacist groups and organizations in India.

23. Defendant has a track record of inciting, instigating and overseeing violence against non Hindus. In 2005, the United States officially recognized and acknowledged the defendant's complicity in the 2002 massacre of Muslims in Gujarat by revoking the defendant's visa and putting a ban on his entry into the United States under the provision of International Freedom Act of 1998.

24. Defendant personally participated in making, approving, ordering and enforcing the policy of curfew, communication black out, torture, enforced disappearances, extra judicial killings and other human rights violations going on in Jammu and Kashmir since August 05, 2019.

25. Defendant Modi shares command and control responsibility for wrongs being committed against people by the security forces in Kashmir.

26. Defendant Modi is liable in personal capacity as well as shares command and control responsibility for ordering torture on plaintiffs and class members.

27. Defendant Amit Shah is Home Minister in the Cabinet of Defendant Modi and is also member and leader of Hindu supremacist BJP Party. Defendant Shah participated in formulating and carrying out the policy of curfew, communication, torture, enforced disappearances and other human rights violations against people of Kashmir since August 05, 2019. In fact, all the security forces deployed in Kashmir follow the command, orders

and policy laid down by defendant Shah as Home Minister. Defendant Shah shares command and control responsibility for wrongs being committed against people by the security forces in Kashmir.

28. Defendant Shah is liable in personal capacity as well as shares command and control responsibility for ordering torture on plaintiffs and class members.

29. Defendant Kanwal Jeet Singh Dhillon aka "KJS Dhillon" is serving as Lt. General in Indian Army and is currently commander of Indian forces deployed in Kashmir. Since August 05, 2019, forces under the command of defendant Dhillon has brutally been enforcing and implementing curfew, communication blackout, torture, illegal detentions, enforced disappearances and extra judicial killings.

30. Defendant Dhillon is known for committing violence against unarmed civilians in Kashmir. Earlier in 2019, defendant Dhillon in a public statement openly threatened that he has ordered this soldiers to shoot kids in Kashmir if they came out to protest and warned the mothers in Kashmir to keep their kids at home if they want to see them alive.

31. Defendant Dhillon is liable in personal capacity as well as shares command and control responsibility for ordering torture on plaintiffs and class members.

32. The allegations herein maintain that Defendants committed acts and omissions in violations of the law of nations and of the laws of the United States of America.

## C. Class Allegations

33. The class consists of all men, women, and children who are the victims of mental and physical torture and next of kin of those who suffered wrongful deaths in Indian occupied Jammu and Kashmir at the hands of security forces and due to the policies laid down and carried out by the defendants, severally or jointly.

9

34. The exact number of class members is not known, but it is estimated that the class includes several thousand victims from Kashmir and their next of kins who have been suffering since August 05, 2019. The class is so numerous that joinder of individual Plaintiffs is impracticable.

35. There are common questions of law and fact in this action that affect and relate to each member of the class, including:

    a.  Whether Defendants authorized, condoned, commanded, or directed the unlawful acts of the authorities and forces under his control;

    b.  Whether Defendants aided and abetted or conspired with other forces;

    c.  Whether Defendants knew or should have known that their directives, policies and actions, the primary purpose of which was to spread terror among the civilian population, will cause the harm to the people of Jammu and Kashmir.

    d.  Whether Defendants' actions give rise to liability under applicable international and domestic laws.

36. This action is properly maintained as a class action because a) Defendants have acted and failed to act in a way generally applicable to the class, making any declaratory relief awarded appropriate to the class as a whole, and b) questions of law and fact common to the class predominate over questions affecting individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### III. JURISDICTION AND VENUE

37. Defendants are liable for mental and physical torture and wrongful deaths, under actual and apparent authority and under color of law through the ordering and direction of his

forces and authorities to suppress people of Kashmir, and attempted genocide of the Muslim population of Kashmir as defined by the customary international law, the Vienna Convention, and the Torture Victim Protections Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992).

38. Defendants are further liable for violations of customary international law and treaty law prohibiting the commission of human rights violations and war crimes. Accordingly, this Court has jurisdiction over this action based on 28 U.S.C. Section 1350 (Alien Tort Statute) and 28 U.S.C. Section 1331. The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. Section 1367.

39. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. Sections 1391(b) (3). This Court has personal jurisdiction over the Defendant as the defendant is going to arrive in Houston on September 21, 2019.

40. The defendants' actions of August 5, 2019 and from 2014 onward, fall within 10-year statute of limitation set by the Torture Victim Protection Act (TVPA).

## IV. STATEMENT OF FACTS

### A. Overview

41. India has been occupying the region of Jammu and Kashmir since 1947 and the disputed territory has been subject of multiple UN resolutions calling for a plebiscite and right to self-determination. On August 05, 2019, India unilaterally and in violation of international laws and norms (jus cogens) annexed the region of Kashmir under its occupation, disenfranchised millions of Kashmiris and imposed a brutal curfew which has turned the hospitals into graveyards.

42. Although human rights violations by the Indian forces in Kashmir have been going on for over two decades now, since the defendant Narendra Modi came into power in 2014, there has been an escalation in such violations. Even UN Human Rights Council in 2018 took a strong notice of the ongoing egregious human rights violations in Kashmir by the Modi regime.

**Historical Context**

43. In 1947, as a princely state, the state of Jammu & Kashmir had the option of acceding to either of the two dominions, Hindu-majority India or Muslim-majority Pakistan. An uprising in the region of Poonch by Jammu Muslims against the Dogra ruler led to the Dogra ruler requesting military assistance from the Government of India. The Government of India agreed to do so only if the Dogra ruler signed a treaty of accession, which gave India control over the foreign affairs, defense, and communications of the region. It is important to note that the Dogra ruler was not acting in accordance to the aspirations of the people and was considered illegitimate. The treaty promised that the state's future would be determined "by a reference to the people." Both India and Pakistan went to war in 1948, resulting in Indian occupation of two-thirds of the former princely state and one-third by Pakistan.

44. To put an end to the fighting, India took the dispute to the United Nations, which called for a plebiscite in the region once each country removed their forces from their side of Kashmir. Neither of the regions fulfilled these conditions and hence, the plebiscite has never taken place, and this remains the root of the issue, even more than seventy years later.

**Current Crisis**

45. On August 5, 2019, the Indian government, led by the Hindu nationalist BJP party, broke with decades of precedent and unilaterally revoked the protected status of Jammu & Kashmir under the Indian constitution without consulting any Kashmiri political or civil society leaders. This authoritarian and anti-democratic action immediately followed the deployment of 40,000 additional troops into Kashmir (on top of the almost 700,000 already stationed there), the imposition of a total communications blackout and curfew, and arrest of hundreds of political, civil society, and human rights leaders in Kashmir.

46. This action has had devastating consequences for the people of Kashmir, which include:

> **Total communications blackout**: Since August 5, Kashmiris have been prevented from communicating with each other or the outside world, whether through landlines, mobile devices, or the Internet. The vast majority of Kashmiris in the U.S. and across the world have been unable to make any contact with loved ones.

> **Ban on media and free speech**[11]: Independent local and international media have been effectively prevented from reporting on the ground. What few accounts have emerged depict horrific conditions and were smuggled out of Kashmir on USB drives or communicated by Kashmiri expatriates who escaped the region.

> **Round-the-clock curfew and ban on assembly**: People are confined to their homes, and when allowed to leave, prohibited from assembling in groups of more than four people.

---

[11] See the news report "India's Kashmir Clampdown Turns Hospitals Into 'Graveyards'" at:
https://www.telegraphindia.com/india/kashmir-doctor-speaks-up-whisked-away/cid/1700525

> ➤ **Violations of religious freedom**: Major mosques throughout the valley have remained closed, including during Eid-ul-Adha, one of the holiest days for Muslims.

> ➤ **Human rights abuses**: Widespread reports from independent media and firsthand accounts have confirmed that hundreds of Kashmiris, some as young as 11 years old, have been rounded up and detained indefinitely. Many have been sent to jails outside of Kashmir. Genocide Watch has issued a Genocide Alert for Kashmir.

47. In addition, since August 05, Indian Government on the orders of Defendant Modi, Shah and Dhillon has:

   o deployed additional 40000 troops into Kashmir (in addition to the 700,000 already stationed in Kashmir);

   o put all political figures under house arrest

   o detained more than 4000 people including – members of civil society lawyers, doctors, journalists and human rights defenders etc.

   o closed all schools & colleges

   o placed everyone under curfew

   o cut off all access to communication including - landlines, broadband, internet, cell phones, and the news media

   o stopped local media from reporting on Kashmir

   o blamed BBC and Reuters for false reporting when it managed to obtain a footage showing the situation on ground in Kashmir

- o  stopped issuing death certificates to civilians who are killed during protests[12]

- o  instructed hospitals & doctors not to treat civilians who are injured during protests

- o  stopped people's access to cash, food and medical supplies through a strict shoot at sight curfew.

## B. Defendants' participation

48. Since 2014, Defendant Modi has been heading the government of India as Prime Minister.

49. Defendant Modi, as Prime Minister of India, formulate the policies, issues orders, and oversees the implementation of policies and actions of the government of India in Kashmir. Defendant Modi has publicly owned and stated that August 05, 2019 actions of the actions in Kashmir and ensuing policies are his.

50. Defendant Modi is directly, personally, severally as well as jointly liable for the suffering of the named plaintiffs and the class members.

51. Defendant Amit Shah is the Union Home Minister in the cabinet of Prime Minister Modi. As Home Minister, Defendant Shah is fully complicit in the policies and actions taken in Kashmir by the government forces since August 05, 2019. Defendant Shah, as Union Home Minister is also the administrative head of all the security forces in India.

52. Defendant Shah is directly, personally, severally as well as jointly liable for the suffering of the named plaintiffs and the class members.

---

[12] *See* August 26th report by Independent UK "Ghosts of Kashmir: Indian authorities refusing to issue death certificates for civilians killed in clashes, say families" https://www.independent.co.uk/news/world/asia/kashmir-india-death-certificates-jammu-protests-violence-modi-a9079371.html

53. Defendant KJS Dhillon is Lt. General of Indian Army and commander of the Indian forces currently deployed in Kashmir. Indian forces in Kashmir act under direct order and supervision of the Defendant Dhillon. Additionally, Defendant Dhillon also has command and control responsibility towards actions taken by the soldiers under his command.

54. Defendant Dhillon is directly, personally, severally as well as jointly liable for the suffering of the named plaintiffs and the class members.

## C. Inadequacy of local remedies

55. The plaintiffs and the class will not receive any remedy from within Indian system.

56. Despite UN Resolutions, India has not held plebiscite in Kashmir to decide the fate of the region according to the wishes of the people for the last seventy plus years.

57. India has a consistent policy, practice and pattern of impunity. India's record on human rights is marred with torture and human rights violations which go unpunished and unprosecuted for decades despite abundance of implicating evidence. November 1984 genocidal violence against of Sikhs throughout India in the aftermath of Indira Gandhi's assassination and 2002 massacre of Muslims in Gujarat committed with the complicity of Defendant Modi are just few of many such glaring examples of impunity. While the civilized nations like USA, Canada, UK and many European countries revoked defendant's Modi's visa due to his complicity in massacre of Muslims, Indian system and so-called democracy rewarded the mass murderer Modi with the premiership of the country, second time in a row.

58. From the above, it becomes clear that there can be no justice in a country where the government covers up the acts and omissions of a man responsible for the deaths and injuries of thousands persecuted solely because of their religious beliefs. There is no remedy in India. Jurisdiction is proper in this forum and this court must allow for this case to proceed accordingly.

## V. CLAIMS FOR RELIEF

59. Plaintiffs' causes of action arise under and violate both domestic law and international law as defined in agreements, declarations, conventions, resolutions, and treaties, including but not limited to the following:

    a.   Customary international law and treaties of the United States;

    b.   Statutes and common law of the United States;

    c.   Statutes and common law of Texas;

    d.   Any other applicable laws, domestic, foreign or international.

60. The claims herein under the law of nations are based on norms that are definable, obligatory, and universally recognized.

61. The law of nations prohibits the targeting of civilians and the blatant discrimination based on targeting members of a specific religious group.

62. The law of nations prohibits acts or threats of violence against a specific group of people targeted because of their religious beliefs.

63. Based on the foregoing, Defendant is guilty of Crimes against Humanity, Cruel, Inhuman, or Degrading Treatment or Punishment, Extrajudicial Killing, Wrongful Death, Negligence, Battery, and Intentional and Negligent Infliction of emotional Distress.

64. The testimony of Plaintiffs and other witnesses will show that Defendants acting in conjunctions as well as severally, at least since August 05, 2019, have taken actions in Jammu and Kashmir towards Muslim community causing bodily injury, harm, mental distress to the plaintiffs and class members.

65. Plaintiffs "TFK" and "SMS" have requested that their identities be withheld at this stage of the proceedings, fearing retaliation and harm to their family members living in Kashmir, India at the hands of defendants Modi, Shah and Dhillon and their agents.

66. The United States courts have held that in recognizing the right to a public trial of the Defendant, such considerations "must be balanced against other interests that might justify closing the courtroom to the public, including preservation of order, protection of parties or witnesses, or maintenance of the confidentiality of certain information."[13]

## GENERAL ALLEGATIONS

67. The acts described in the Complaint were undertaken under color of law.

68. The acts and injuries to Plaintiffs and their deceased and injured relatives described herein, as well as those similarly situated, were part of a pattern and practice of systematic human rights violations designed, ordered, implemented, and directed with the participation of Defendants and carried out by local law enforcement and military authorities and personnel acting at their direction, and/or with their encouragement and acquiescence.

## FIRST CLAIM FOR RELIEF
### (Crimes against Humanity)

---

[13] *See United States v. Lloyd*, 520 F.2d 1272, 1274 (2d Cir. 1975).

69. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

70. The abuses committed against Plaintiffs and their deceased loved ones constitute crimes against humanity. Defendants knew or should have known that the direction given to the local law enforcement and military personnel under their command and direction would have resulted in the death and torture of thousands in Jammu and Kashmir, India.

71. As a result, Defendant is responsible for the wrongful death (murder) of the next of kins of plaintiffs or class members and these murders were knowingly committed as part of a widespread or systemic attack against a specific population, Muslim people of Kashmiri descent.

72. Defendants, by virtue of their inhuman acts and omissions, also caused great suffering and/or serious injury to body or to mental or physical health in the context of a widespread or systemic attack against a specific population.

73. Defendants' acts and omissions constitute "tort[s]… committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. Section 1350 and also violate 28 U.S.C. Section 1331 in that the acts and omissions against Plaintiffs violated customary international law prohibiting war crimes as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

74. The acts and omissions constituting crimes against humanity caused Plaintiffs to suffer damages, including physical and mental pain and suffering, in amounts to be determined by a jury at trial.

75. Defendants' acts and omissions were deliberate, willful, wanton, malicious, intentional, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined by a jury at trial.

**SECOND CLAIM FOR RELIEF**
**(Cruel, Inhuman, or Degrading Treatment or Punishment)**

76. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

77. The abuses committed against Plaintiffs and deceased next of kin described herein each constitute cruel, inhuman, or degrading treatment or punishment.

78. These acts include, as alleged in this Complaint also constitute torts committed in violation of the law of nations, and thus of the United States, as reflected in federal common law, which incorporates extrajudicial killing, pursuant to 28 U.S.C. Sections 1331 and 1350.

79. Defendants' conduct constitutes a violation of the law of nations and customary international law prohibiting torture, cruel, inhuman, or degrading treatment or punishment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities. Extrajudicial killing is similarly reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities. Therefore, such acts and omissions are actionable.

80. The acts and omissions constituting cruel, inhuman, or degrading treatment or punishment caused Plaintiffs to suffer damages, including physical and mental pain and suffering, in amounts to be determined by a jury at trial.

20

81. Defendants' acts and omissions were deliberate, willful, wanton, malicious, intentional, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined by a jury at trial.

## THIRD CLAIM FOR RELIEF
### (Extrajudicial Killing)

82. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

83. With regard to the events alleged herein, Defendants' acted under the actual and/or apparent authority and/or color of law of the State of India. The killings were deliberate and not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensible by civilized peoples. The killings were not lawfully carried out under the authority of any country or court.

84. The killings constitute extrajudicial killings under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. Section 1350). Additionally, the killings constitute torts committed in violation of the law of nations, and thus of the United States, as reflected in federal common law, which incorporates extrajudicial killing, pursuant to 28 U.S.C. Sections 1331 and 1350.

85. Defendants' conduct constitutes violations of the law of nations and customary international law prohibiting extrajudicial killing, reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

86. Defendants knew or should have known that their acts and/or omissions would have resulted in the thousands of deaths by the hands of the military and police at their command and direction.

87. Upon information and belief, no adequate remedy exists at law under the laws of India, which is the place where the conduct giving rise to this action and these claims occurred, nor is any adequate remedy available through the courts of India.

88. The acts and omissions constituting extrajudicial killings caused Plaintiffs to suffer damages, including physical and mental pain and suffering, in amounts to be determined by a jury at trial.

89. Defendants' acts and omissions were deliberate, willful, wanton, malicious, intentional, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined by a jury at trial.

## FOURTH CLAIM FOR RELIEF
### (Wrongful Death)

90. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

91. Defendants' owed a duty to refrain from intentionally and wantonly harmful or outrageous conduct. Defendant owed a duty to Plaintiffs' decedents under customary international law, including but not limited to the Geneva Conventions, which imposes duties upon an occupying power and its officials with regard to protected populations.

92. Defendants breached that duty by authorizing the targeting of members of the Muslim religion in western India and authorizing the use of excessive force, violence, and depravity against said population by members of the military and police forces under

their command and direction. Defendants knew or should have known that innocent people would be killed or wounded.

93. As a direct and proximate cause of Defendants' actions and omissions constituting breach of that duty, next of kin of named plaintiff and of class members were killed and suffered injury. It was reasonably foreseeable that such deaths and injuries would occur.

94. Plaintiffs are representatives of class and their deceased relatives and loved ones and bring this suit on behalf as their next of kin.

95. The acts and omissions constituting wrongful death caused Plaintiffs to suffer damages, including physical and mental pain and suffering, in amounts to be determined by a jury at trial.

96. Defendants' acts and omissions were deliberate, willful, wanton, malicious, intentional, and/or oppressive, and should be punished by an award of punitive damages in an amount to be determined by a jury at trial.

## FIFTH CLAIM FOR RELIEF
### (Negligence)

97. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

98. Defendants owed a duty to Plaintiffs and their decedents to prevent the deliberate, willful, wanton, malicious, intentional, and/or oppressive torture, killings, and assaults on the Muslim people of the region of Jammu and Kashmir. Further Defendants owed a duty to Plaintiffs and their decedents to refrain from intentional and wantonly harmful outrageous conduct.

99. Defendants breached that duty by authorizing the military and police forces under his command and direction to engage in the deliberate, willful, wanton, malicious,

intentional, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir.

100.     As a direct and proximate cause of Defendants' acts and omissions constituting breach of that duty, Plaintiffs and their decedents were harmed. It was reasonably foreseeable that such breach would result in this harm.

101. Beyond mere negligence, Defendants' acts were intentional, deliberate, willful, wanton, malicious, and/or oppressive torture, killings, and assaults on the Muslim people of the Jammu and Kashmir and should be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined by a jury at trial.

## SIXTH CLAIM FOR RELIEF
### (Public Nuisance)

102. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

103.  Plaintiffs', as members of the public, had a right to health, public peace, public comfort, and/or public convenience.

104.  Defendants deliberately and unreasonably interfered with the aforementioned rights by authorizing, commanding, and directing the attack of intentional, deliberate, willful, wanton, malicious, and/or oppressive torture, killings, and assaults by the police and military forces under their command and direction specifically targeted against the Muslim people of the region of Jammu and Kashmir.

105.  The curfew and clamp down arranged and directed as well as encouraged, condoned, and acquiesced in by Defendants caused substantial personal and property damage and endangered the comfort, repose, health and/or safety of Plaintiffs, their decedents, and thereby constitute a public nuisance.

106. The public nuisance created by Defendants directly caused special injuries and damages to Plaintiffs and their decedents, unique from those suffered by the general public. Said public nuisance interfered with, obstructed, and or injured the individual rights of Plaintiffs and their decedents.

107. Defendants' acts and omissions were intentional, deliberate, willful, wanton, malicious, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir.

108. Defendants' acts were intentional, deliberate, willful, wanton, malicious, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir, constituting a public nuisance, and should be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined by a jury at trial.

## SEVENTH CLAIM FOR RELIEF
### (Battery)

109. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

110. Defendants by engaging in the intentional, deliberate, willful, wanton, malicious, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir also brought about harmful and/or offensive contact with the persons and bodies of Plaintiffs and their decedents.

111. As a direct and proximate cause of Defendants' conduct, Plaintiffs and their decedents were harmed and such harm was the reasonably foreseeable consequence of the contact.

112. Defendants' acts and omissions caused Plaintiffs and their decedents to suffer damages, severe physical and mental pain and suffering, in amounts to be determined by a jury at trial.

113. Defendants' acts were intentional, deliberate, willful, wanton, malicious, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir, constituting battery, and should be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined by a jury at trial.

### EIGHTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

114. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

115. Defendants' authorization, command over, and direction of the intentional, deliberate, willful, wanton, malicious, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir, which Defendant knew or should have known would cause the deaths, injury, and suffering of many innocent civilians, amounts to extreme and outrageous conduct that transcends all possible bounds of decedent and is utterly intolerable in a civilized society.

116. Defendant intended to cause Plaintiffs and their decedents to suffer humiliation, mental anguish, and extreme emotional distress, or in the alternative Defendant recklessly disregard a substantial probability of causing humiliation, mental anguish, and severe emotional distress to Plaintiffs and their decedents with this conduct.

117. As a direct and proximate cause of Defendants' outrageous conduct, Plaintiffs and their decedents suffered severe emotional distress and mental suffering. It was foreseeable that such attacks would cause this suffering.

118. Defendants' acts were intentional, deliberate, willful, wanton, malicious, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir, constituting Intentional Infliction of Emotional Distress, and should be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined by a jury at trial.

**NINTH CLAIM FOR RELIEF**
**(Negligent Infliction of Emotional Distress)**

119. Plaintiffs re-allege and incorporate by reference all the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

120. Defendants owed a duty to Plaintiffs and their decedents to prevent the deliberate, willful, wanton, malicious, intentional, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir. Further Defendant owed a duty to Plaintiffs and their decedents to refrain from intentional and wantonly harmful outrageous conduct.

121. Defendants breached that duty by authorizing, commanding, and directing the military and police forces under his command and direction to engage in the deliberate, willful, wanton, malicious, intentional, and/or oppressive torture, killings, and assaults on the Muslim people of Jammu and Kashmir. Defendant violated this duty and created an unreasonable and foreseeable risk of substantial bodily harm or death to the Plaintiffs and their decedents. The attacks placed the Plaintiffs and their decedents in grave danger and/or made them reasonably fear for their physical safety. During the attacks that

Defendant planned, authorized, and directed, as well as condoned and acquiesced in, the surviving Plaintiffs all feared for their lives and experienced great trauma and shock.

122. Plaintiffs have suffered and will continue to suffer extreme mental anguish and emotional distress that was directly caused by the trauma, shock, and fear that they experienced during and directly after the attacks orchestrated by Defendant.

123. Moreover, Defendants' conduct caused many of the Plaintiffs to witness members of their immediate families suffer violent deaths or grave physical injury during the attacks. Defendants' conduct was a substantial factor in bringing about the injuries and deaths to which Plaintiffs bore witness.

124. Many Plaintiffs suffered and continue to suffer emotional torment caused by directly witnessing the violent death or serious physical injury of relatives during the attacks authorized, commanded, and directed as well as condoned and acquiesced in by Defendants.

125. When Defendants' authorized, commanded, and directed as well as condoned and acquiesced in the attacks, he carelessly and negligently ignored the obvious risk of causing the Plaintiff's this trauma, shock, fear, and several emotional mental suffering. Defendants' disregard for the substantial risk of causing this trauma, suffering, and fear, was so extreme and degree as to go beyond all possible bounds of decency, and are utterly intolerable in a civilized society.

126. Defendants' acts were negligent infliction of emotional distress in the torture, killings, and assaults on the Muslim people of Jammu and Kashmir, and should be punished by an award of punitive damages in addition to compensatory damages, in respective amounts to be determined by a jury at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against Defendants Modi, Shah and Dhillon, as follows:

a.  For compensatory damages in the amount of one hundred (100) million dollars.;

b.  For punitive and exemplary damages in an amount to be proven at trial;

c.  For such other, further, or different relief as this honorable Court may deem to be just, proper, fitting, and equitable.

Submitted on: September 19, 2019.

Plaintiff - Kashmir Khalistan Referendum Front
(KKRF) through its coordinator
Gurpatwant Singh Pannun
7520 Astoria Blvd, Suite 170,
East Elmhurst, NY 11370
+1-917-789-2914
gurpatwant.pannun@gmail.com

Plaintiff - Ms. TFK
Mailing Address:
c/o Gurpatwant Singh Pannun
7520 Astoria Blvd, Suite 170,
East Elmhurst, NY 11370
+1-917-789-2914

Plaintiff - Mr. SMS
Mailing Address:
c/o Gurpatwant Singh Pannun
7520 Astoria Blvd, Suite 170,
East Elmhurst, NY 11370
+1-917-789-2914

# EXHIBIT "A"

Report by
Office of the United Nations High Commissioner
for Human Rights
Update of the Situation of Human Rights in Indian-Administered Kashmir and Pakistan-
Administered Kashmir from May 2018 to April 2019

# Office of the United Nations High Commissioner

# for Human Rights

**Update of the Situation of Human Rights in Indian-Administered Kashmir and
Pakistan-Administered Kashmir from May 2018 to April 2019**

8   July 2019



# Contents

*Page*

I.  Executive Summary ................................................................................................. 3

II.  Introduction ............................................................................................................ 8

III.  Methodology ........................................................................................................... 9

IV.  Update on the political situation ............................................................................ 10

V.  Human rights violations in Indian-Administered Kashmir ................................... 13

    A.  Civilian killings and excessive use of force .................................................. 13

    B.  Continued use of pellet-firing shotgun .......................................................... 16

    C.  Cordon and Search Operations ...................................................................... 17

    D.  Arbitrary detention ........................................................................................ 18

    E.  Impunity for human rights violations ............................................................ 20

    F.  Restrictions on freedom of expression, censorship and attack on press freedoms ............... 24

    G.  Restrictions on freedom of assembly and association .................................... 27

    H.  Torture ........................................................................................................... 28

    I.  Targeting of Kashmiri Muslims outside Jammu and Kashmir ........................ 29

VI.  Abuses by armed groups ........................................................................................ 30

VII.  Human Rights Violations in Pakistan-Administered Kashmir ................................ 34

    A.  Constitutional and legal structures impacting the enjoyment of human rights ........................ 34

    B.  Restrictions on the rights to freedom of expression and association ............... 35

    C.  Business and human rights ............................................................................. 37

    D.  Impact of counter-terrorism on human rights ................................................ 38

    E.  Restrictions on the freedom of religion or belief ........................................... 39

    F.  Enforced or involuntary disappearances ........................................................ 39

VIII.  Conclusions and recommendations ........................................................................ 41

IV.  Annex:  Responses from concerned Member States ................................................ 43

# I.  Executive Summary

1.    This second report of the Office of the United Nations High Commissioner for Human Rights (OHCHR) on the situation of human rights in Indian-Administered Kashmir and Pakistan-Administered Kashmir covers the period from May 2018 to April 2019.

2.    On 14 June 2018, OHCHR released a first report on the human rights situation in Indian-Administered Kashmir and Pakistan-Administered Kashmir. That report focused on allegations of serious human rights violations, notably excessive use of force by Indian security forces that led to numerous civilian casualties, arbitrary detention, impunity for human rights violations and human rights abuses committed by armed groups allegedly supported by Pakistan. The report also examined the human rights situation in Pakistan-Administered Kashmir and found that human rights violations there were more structural in nature; these included restrictions on the freedom of expression and freedom of association, institutional discrimination of minority groups and misuse of anti-terror laws to target political opponents and activists. The report made a wide range of recommendations to the Governments of India and of Pakistan and also urged the Human Rights Council to consider the findings of the report, including the possible establishment of an international commission of inquiry to conduct a comprehensive independent investigation into allegations of human rights violations in Kashmir.

3.    On 10 September 2018, the High Commissioner for Human Rights informed the Human Rights Council during its 39th session that the OHCHR report's findings and recommendations had "not been followed up with meaningful improvements, or even open and serious discussions on how the grave issues raised could be addressed." Moreover, neither India nor Pakistan had taken any concrete steps towards providing OHCHR with unconditional access to their respective sides of the Line of Control. The High Commissioner also informed Member States that OHCHR would continue its monitoring and reporting work on Kashmir.

4.    This report is based on information collected by OHCHR through monitoring the situation in the Indian state of Jammu and Kashmir (consisting of the Kashmir Valley, the Jammu and Ladakh regions) and Pakistan-Administered Kashmir (Azad Jammu and Kashmir and Gilgit-Baltistan). It is issued pursuant to the mandate of the High Commissioner for Human Rights, as provided by United Nations General Assembly resolution 48/141.

5.    As noted in the 2018 report, the quantity and quality of information available on Indian-Administered Kashmir contrasts significantly to Pakistan-Administered Kashmir. Despite significant challenges, NGOs, human rights defenders and journalists are able to operate in the Indian state of Jammu and Kashmir, generating documentation on the ongoing human rights violations there. Restrictions on the freedoms of expression, opinion, peaceful assembly and association in Azad Jammu and Kashmir and Gilgit-Baltistan have limited the ability of observers, including OHCHR, to assess the human rights situation there.

6.    Since the release of the first report on the situation of human rights in Kashmir, the political coalition ruling the Indian state of Jammu and Kashmir disbanded and was replaced by direct federal rule, which is also known as Governor's rule. In Pakistan-Administered Kashmir, a joint session of the Azad Jammu and Kashmir (AJK) Council and Azad Jammu and Kashmir Legislative Assembly passed the 13th Amendment to the Interim Constitution of Azad Jammu and Kashmir on 1 June 2018. Similarly, Pakistani authorities have also issued some reforms in Gilgit-Baltistan. Tensions between India and Pakistan escalated after the 14 February 2019 suicide bombing in Pulwama, when a vehicle borne improvised explosive device struck a convoy of Indian security forces, killing 40 soldiers of the Central Reserve Police Force, which is a federal paramilitary unit widely deployed in Indian-Administered Kashmir.

## Human rights violations in Indian-Administered Kashmir

7.    According to the Jammu and Kashmir Coalition of Civil Society (JKCCS), around 160 civilians were killed in 2018, which is believed to be the highest number in over one decade. Last year also registered the highest number of conflict-related casualties since 2008

with 586 people killed including 267 members of armed groups and 159 security forces personnel. However, the Union Ministry for Home Affairs claimed only 37 civilians, 238 terrorists and 86 security forces personnel were killed in 2018 up to 2 December 2018.

8.      According to JKCCS, 1,081 civilians have been killed by security forces in extrajudicial killings between 2008 and 2018. Of the 160 civilians reportedly killed in 2018, 71 were allegedly killed by Indian security forces (while 43 were killed by armed group members or unidentified gunmen and 29 were killed by shelling and firing by Pakistani troops in areas along the Line of Control). The Kashmir Valley, where most of the protests and armed encounters are reported to have taken place, accounted for 122 of these civilian killings. In the first 3 months of 2019, 21 civilians were reportedly killed by various perpetrators including armed groups, unknown gunmen, Indian security forces and cross-border shelling by Pakistani security forces along the Line of Control.

9.      Despite the high number of civilians being killed near encounter sites in 2018, there is no information about any new investigation into excessive use of force leading to casualties. There is no information on the status of the five investigations launched into extrajudicial executions in 2016. The Indian state of Jammu and Kashmir did not establish any investigations into civilian killings in 2017. No prosecutions have been reported. It does not appear that Indian security forces have been asked to re-evaluate or change their crowd-control techniques or rules of engagement.

10.     Indian security forces continue to use pellet-firing shotguns in the Kashmir Valley as a crowd-control weapon despite concerns as to excessive use of force and the large number of incidental civilian deaths and injuries that have resulted. The 12-gauge pump-action shotgun firing metal pellets is one of the most dangerous weapons used in Kashmir. According to information from Srinagar's Shri Maharaja Hari Singh Hospital, where most pellet shotgun injured are treated, 1,253 people have been blinded by the metal pellets used by security forces from mid-2016 to the end of 2018.

11.     So-called "cordon and search operations", a much-criticized military strategy employed by the Indian security forces in the early 1990s, was reintroduced in the Kashmir Valley in 2017. According to national and international human rights organizations, cordon and search operations enable a range of human rights violations, including physical intimidation and assault, invasion of privacy, arbitrary and unlawful detention, collective punishment and destruction of private property.

12.     Authorities in Indian-Administered Kashmir continue to use various forms of arbitrary detention to target protesters, political dissidents and other civil society actors. OHCHR was informed that despite the Jammu and Kashmir High Court setting aside numerous the Jammu and Kashmir Public Safety Act (PSA) detention orders, the Jammu and Kashmir authorities continue to detain people by imposing new PSA orders even before suspects leave prisons. In July 2018, the Government of Jammu and Kashmir amended section 10 of the PSA, removing the prohibition on detaining permanent residents of Jammu and Kashmir outside the state.

13.     The Armed Forces (Jammu and Kashmir) Special Powers Act 1990 (AFSPA) remains a key obstacle to accountability. Section 7 of the AFSPA prohibits the prosecution of security forces personnel unless the Government of India grants a prior permission or "sanction" to prosecute. In nearly three decades that the law has been in force in Jammu and Kashmir, there has not been a single prosecution of armed forces personnel granted by the central government. The Indian Army has also been resisting efforts to release details of trials conducted by military courts where soldiers were initially found guilty but later acquitted and released by a higher military tribunal.

14.     Jammu and Kashmir continues to face frequent barriers to internet access as the authorities continue to suspend arbitrarily internet services. According to a United Nations Educational, Scientific and Cultural Organization (UNESCO), South Asia reported the highest number of shutdowns in the world between April 2017 and May 2018 with India accounting for the highest level of shutdowns in the world. Half of all internet shutdowns in India were reported from the Kashmir Valley. A widely followed Indian civil society group that tracks internet shutdowns reports that 65 of the 134 incidents of internet shutdowns

4

recorded in the country in 2018 were in Jammu and Kashmir. In the first four months of 2019, Jammu and Kashmir experienced 25 instances of internet shutdown.

15.     On 28 February 2019, the central government declared religious-political organization Jamaat e Islami (Jammu and Kashmir) an unlawful association under section 3(1) of the Unlawful Activities (Prevention) Act 1967. On 22 March 2019, the central government declared the pro-independence Jammu and Kashmir Liberation Front (Yasin faction) an unlawful association. Political leaders in Jammu and Kashmir criticized the ban on Jamaat-e-Islami and the Jammu and Kashmir Liberation Front as an attack on civil liberties and one that would have a "major social impact" in the state.

16.     No security forces personnel accused of torture or other forms of degrading and inhuman treatment have been prosecuted in a civilian court since these allegations started emerging in the early 1990s. Rizwan Pandit, a school principal from Pulwama district aged 29 who died while in police custody between 18 and 19 March 2019, appears to have been tortured while in custody.

**Abuses by armed groups**

17.     The Government of India accuses armed groups supported by Pakistan of committing human rights abuses including targeting civilians and off-duty soldiers in the Indian state of Jammu and Kashmir. According to Indian authorities, "cross-border terrorism emanating from Pakistan" is the main challenge in Jammu and Kashmir.

18.     Since the late 1980s, a variety of armed groups has been actively operating in the Indian state of Jammu and Kashmir, and there has been documented evidence of these groups committing a wide range of human rights abuses, including kidnappings, killings of civilians and sexual violence. While in the 1990s there were reportedly over a dozen armed groups operating in Indian-Administered Kashmir, in recent years four major armed groups are believed to be operational in this region: Lashkar-e-Tayyiba, Jaish-e-Mohammed, Hizbul Mujahideen and Harakat Ul-Mujahidin. All four are believed to be based in Pakistan-Administered Kashmir.

19.     According to JKCCS, 18 civilians were killed by armed group members and another 25 civilians by unknown gunmen in 2018. On 22 March 2019, a 12-year-old boy was reportedly killed when he was held hostage by three members of Lashkar-e-Tayyiba who were trapped in an armed encounter with Indian security forces in Shopian district.

20.     Two armed groups have been accused of recruiting and deploying child soldiers in Indian-Administered Kashmir.

21.     Armed groups were reportedly responsible for attacks on persons affiliated or associated with political organizations in Jammu and Kashmir including the killing of at least six political party workers and a separatist leader. In the lead up to the local body elections scheduled for October 2018, armed groups threatened Kashmiris against participating in the elections and warned of "dire consequences" if those running for elections did not immediately withdraw their nomination papers and publicly apologised for their actions. While armed groups have sporadically threatened political workers in previous elections, the number of attacks in 2018 is amongst the highest in recent times.

22.     The 14 February 2019 suicide bombing on Indian security forces in Pulwama was claimed by Jaish-e-Mohammed. While India blamed Pakistan for continuing to support the group's activities, Pakistan denied the allegations and asked India to provide "actionable evidence" about the involvement of any Pakistani national. Pakistan Foreign Minister Shah Mehmood Qureshi told an international news organization that Jaish-e-Mohammed founder Mohammad Masood Azhar is present in Pakistan and if India provides strong evidence then they will arrest him in accordance with applicable legal processes. However, a spokesperson for the Pakistan Army denied that Jaish-e-Mohammed "exists formally" in Pakistan. On 1 May 2019, the United Nations Security Council Da'esh and Al-Qaida Sanctions Committee announced that it had added Mohammad Masood Azhar to its list of individuals or entities subject to the assets freeze, travel ban and arms embargo. On 28 March 2019, Pakistan

rejected the Indian dossier detailing proof of Jaish-e-Mohammed's complicity in the Pulwama attack.

23.    On 22 February 2019, the Financial Action Task Force (FATF), an inter-governmental organization that monitors money laundering and terrorist financing, said Pakistan had made a "high-level political commitment" to work with FATF "to address its strategic counter-terrorist financing-related deficiencies". However, FATF added that Pakistan "does not demonstrate a proper understanding of the TF [terror financing] risks posed by Da'esh, AQ [Al Qaeda], JuD [Jamaat ud Dawa], FiF [Falah-i-Insaniyat Foundation], LeT [Lashkar e Tayyiba], JeM [Jaish-e-Mohammed], HQN [Haqqani Network], and persons affiliated with the Taliban." It urged Pakistan to address its "strategic deficiencies" and complete its action plan.

24.    Pakistan-based armed groups that operate mostly in Indian-Administered Kashmir have also been accused of harassing and threatening nationalist and pro-independence political workers in Pakistan-Administered Kashmir.

25.    On 2 August 2018, unknown armed group members attacked and burned down at least 12 schools in Gilgit-Baltistan's Diamer district. At least half were girls' schools.

## Human Rights Violations in Pakistan-Administered Kashmir

26.    In response to OHCHR's observations in the June 2018 report, the Government of Pakistan maintained that the constitutional and legal structures of Azad Jammu and Kashmir and Gilgit-Baltistan adequately protect the rights of its citizens. However, OHCHR's monitoring and analysis found that these concerns remain. Both regions introduced constitutional changes, but failed to address the main elements that restrict the full enjoyment of all human rights for people living in these regions.

27.    OHCHR highlighted that the Interim Constitution of Azad Jammu and Kashmir places several restrictions on anyone criticizing the region's accession to Pakistan, in contravention of Pakistan's commitments to uphold the rights to freedoms of expression and opinion, assembly and association. However, the amended Interim Constitution of 2018 has retained the clauses that directly contravene international human rights law. It explicitly continues to state, "[N]o person or political party in Azad Jammu and Kashmir shall be permitted to propagate against, or take part in activities prejudicial or detrimental to, the ideology of the State's accession to Pakistan." Azad Jammu and Kashmir's electoral law has not been amended, and it continues to disqualify anyone running for elected office who does not sign a declaration that says, "[I] have consented to the above nomination and that I am not subject to any disqualification for being, or being elected as a member of the Legislative Assembly and in particular I solemnly declare that I believe in the Ideology of Pakistan, the Ideology of State's Accession to Pakistan and the integrity and sovereignty of Pakistan."

28.    Authorities in Gilgit-Baltistan also failed to amend similar provisions in the region's governance rules that restrict the rights to freedoms of expression and opinion, assembly and association. The Government of Gilgit-Baltistan Order 2018 and the updated Gilgit-Baltistan Governance Reforms 2019 retain the same language limiting freedom of association from the Gilgit-Baltistan Empowerment and Self-Governance Order 2009.

29.    Members of nationalist and pro-independence political parties claim that they regularly face threats, intimidation and even arrests for their political activities from local authorities or intelligence agencies. They said often threats are also directed at their family members including children.

30.    In November 2018, 19 activists of the Jammu and Kashmir Liberation Front were charged with "treason" for organising a rally in Kotli area of Azad Jammu and Kashmir. Protesters raised slogans that called on India and Pakistan to demilitarize and leave Kashmir. On 15 March 2019, 30 members of the Jammu Kashmir National Students Federation were arbitrarily detained by Pakistani law enforcement agencies while protesting at the Rawalpindi Press Club in Rawalpindi.

31.     Journalists in Pakistan-Administered Kashmir continue to face threats and harassment in the course of carrying out their professional duties. According to the Committee to Protect Journalists (CPJ), an anti-terrorism court in Gilgit-Baltistan sentenced journalist Shabbir Siham in absentia to 22 years in prison and fined him 500,000 Pakistani Rupees (USD 4,300) on charges of defamation, criminal intimidation, committing acts of terrorism, and absconding from court proceedings. On 21 November 2018, Gilgit-Baltistan authorities arrested journalist Muhammad Qasim Qasimi after he engaged in a verbal argument with a local police official. According to the International Crisis Group (ICG), Pakistani intelligence officials have also warned journalists in Gilgit-Baltistan against criticising the China-Pakistan Economic Corridor (CPEC) projects.

32.     Several major projects have been proposed in Gilgit-Baltistan under CPEC, which is seen as a major infrastructure development boost for the region. According to ICG, the people of Gilgit-Baltistan are resentful because they feel CPEC projects were "designed and implemented without their input" and "will be of little benefit to them". ICG concludes, "the state's response to local dissent and alienation has been an overbearing security presence, marked by army checkpoints, intimidation and harassment of local residents, and crackdowns on anti-CPEC protest."

33.     A key concern in both Azad Jammu and Kashmir and Gilgit-Baltistan is that the local communities do not control natural resources of the territories as these are controlled by Pakistani federal agencies. Political leaders and activists feel their natural resources are exploited for the benefit of Pakistan while the people of Azad Jammu and Kashmir and Gilgit-Baltistan continue to remain largely impoverished.

34.     Authorities in Gilgit-Baltistan continue to use the Anti-Terrorism Act 1997 (ATA) to target political activists, human rights defenders and student protesters. Authorities in Gilgit-Baltistan frequently clamp down on any anti-CPEC dissent with the ATA and the 2016 cybercrimes law. Anyone who protests or criticises CPEC is termed as "anti-national and anti-people".

35.     In the June 2018 report, OHCHR drew attention to the provision in AJK's Interim Constitution that, similar to Pakistan's Constitution, defines who is a real "Muslim" and uses this definition to discriminate against the minority Ahmadiyya community. The amended Interim Constitution of 2018 has made no changes to this discriminatory provision. Human rights lawyers and activists informed OHCHR that Pakistan's blasphemy provisions continue to be in force in Azad Jammu and Kashmir and Gilgit-Baltistan.

36.     OHCHR has received credible information of enforced disappearances of people from Pakistan-Administered Kashmir including those who were held in secret detention and those whose fate and whereabouts continue to remain unknown. In almost all cases brought to OHCHR's attention, victim groups allege that Pakistani intelligence agencies were responsible for the disappearances. There are fears that people subjected to enforced disappearances from Pakistan-Administered Kashmir may have been detained in military-run internment centers in Pakistan.

37.     In May 2018, the Government of Pakistan advised the Supreme Court of Pakistan that 1,330 people were being held in various internment camps and that it required more time to furnish the Court with details of the legal proceedings against them. OHCHR has been informed that there are likely several other cases of enforced or involuntary disappearances in Pakistan-Administered Kashmir but they do not get reported like in rest of Pakistan due to the lack of independent media or independent human rights groups working in these areas. The United Nations Working Group on Enforced or Involuntary Disappearances has received at least one case of a Pakistani national disappeared from Azad Jammu and Kashmir and a permanent resident of Gilgit-Baltistan disappeared from Pakistan.

## Conclusions and recommendations

38.     This report highlights serious human rights violations and patterns of impunity in Indian-Administered Kashmir and significant human rights concerns witnessed in Pakistan-Administered Kashmir. As stated in OHCHR's June 2018 report, there remains an urgent

need to address past and ongoing human rights violations and to deliver justice for all people in Kashmir.

39.　Political tensions between India and Pakistan over Kashmir often result in the increase of ceasefire violations along the Line of Control, including shelling and firing. Ceasefire infringements in 2018 and 2019 resulted in the killing of civilians, destruction of civilian property and displacement of people in both Indian-Administered Kashmir and Pakistan-Administered Kashmir.

40.　As neither the Governments of India nor of Pakistan have taken clear steps to address and implement the recommendations made in OHCHR's June 2018 report, those recommendations are reiterated and restated in this report. Additional recommendations are also addressed to the respective authorities for their consideration.

## II.　Introduction

41.　This second report of the Office of the United Nations High Commissioner for Human Rights (OHCHR) on the situation of human rights in Indian-Administered Kashmir and Pakistan-Administered Kashmir covers the period from May 2018 to April 2019.

42.　On 14 June 2018, OHCHR released a first report on the human rights situation in Indian-Administered Kashmir and Pakistan-Administered Kashmir,[1] covering the period from July 2016 to April 2018. That report focused on allegations of serious human rights violations, notably excessive use of force by Indian security forces that led to numerous civilian casualties, arbitrary detention, impunity for human rights violations and human rights abuses committed by armed groups allegedly supported by Pakistan. The report also examined the human rights situation in Pakistan-Administered Kashmir and found that human rights violations there were more structural in nature; these included restrictions on the freedom of expression and freedom of association, institutional discrimination of minority groups and misuse of anti-terror laws to target political opponents and activists. The report made a wide range of recommendations to the Governments of India and Pakistan and also urged the Human Rights Council to consider the findings of the report, including the possible establishment of an international commission of inquiry to conduct a comprehensive independent investigation into allegations of human rights violations in Kashmir.[2]

43.　India rejected the report's findings and recommendations, accusing the United Nations of violating its "sovereignty and territorial integrity".[3] Pakistan welcomed the report and supported the recommendation to establish a Commission of Inquiry to address allegations of human rights violations in Indian-Administered Kashmir.[4] Pakistan added that "human rights concerns in Azad Jammu and Kashmir and Gilgit-Baltistan should in no way be construed to create a false sense of equivalence".[5]

44.　There has not been substantive discussion of the report in the Human Rights Council. Some Member States, including India and Pakistan, made reference to the report and remote

---

[1]　OHCHR, "Report on the Situation of Human Rights in Kashmir: Developments in the Indian State of Jammu and Kashmir from June 2016 to April 2018, and General Human Rights Concerns in Azad Jammu and Kashmir and Gilgit-Baltistan", 14 June 2018. Available from https://www.ohchr.org/Documents/Countries/IN/DevelopmentsInKashmirJune2016ToApril2018.pdf.
[2]　Ibid, p. 48.
[3]　India, Ministry of External Affairs, "Official Spokesperson's response to a question on the Report by the Office of the High Commissioner for Human Rights on 'The human rights situation in Kashmir'", 14 June 2018. Available from https://www.mea.gov.in/media-briefings.htm?dtl/29978/official+spokespersons+response+to+a+question+on+the+report+by+the+off ice+of+the+high+commissioner+for+human+rights+on+the+human+rights+situation+in+kashmir.
[4]　Pakistan, Ministry of Foreign Affairs, "Pakistan's reaction to the UN report on Human Rights violations in Kashmir", 14 June 2018. Available from http://www.mofa.gov.pk/pr-details.php?mm=NjM4NA.
[5]　Ibid.

monitoring during the debate on the High Commissioner's global update under Item 2 in the 38th and 39th regular sessions of the Human Rights Council in June and September 2018.

45.     On 10 September 2018, the High Commissioner for Human Rights informed the Human Rights Council during its 39th session that the OHCHR report's findings and recommendations had "not been followed up with meaningful improvements, or even open and serious discussions on how the grave issues raised could be addressed."[6] Moreover, neither India nor Pakistan had taken any concrete steps towards providing OHCHR with unconditional access to their respective sides of the Line of Control. Pakistan has stated that it would provide access to OHCHR if India would provide such access to its side. The High Commissioner also informed Member States that OHCHR would continue its monitoring and reporting work on Kashmir.[7] During the 40th session of the Human Rights Council in March 2019, the High Commissioner expressed concern about the military stand-off between India and Pakistan that was then taking place and reminded them that addressing human rights issues must be part of any solution to the conflict.[8]

## III.    Methodology

46.     This report, which supplements and should be read together with OHCHR's report of 14 June 2018,[9] is based on information collected by OHCHR through monitoring the situation in the Indian state of Jammu and Kashmir (consisting of the Kashmir Valley, the Jammu and Ladakh regions) and Pakistan-Administered Kashmir (Azad Jammu and Kashmir and Gilgit-Baltistan).[10] It is issued pursuant to the mandate of the High Commissioner for Human Rights, as provided by United Nations General Assembly resolution 48/141.

47.     Information used in this report is available in the public domain, some of which was obtained by various parties in India through the Right to Information Act,[1] and also reflects the findings of research and monitoring carried out by local, national and international nongovernmental organizations (NGOs) and human rights defenders. Wherever possible, OHCHR has used official documents and statements, such as Parliamentary questions, court orders, and police reports.[12]

48.     OHCHR conducted a small number of confidential interviews to obtain or corroborate information and for expert opinions. Due to access issues and security concerns of witnesses and victims, it was not possible for OHCHR to conduct extensive interviews with direct witnesses or victims of the human rights violations presented in this report. All confidential interviews are referenced with a code.

---

[6]   Human Rights Council, "Opening Statement by UN High Commissioner for Human Rights Michelle Bachelet", 10 September 2018. Available from
      https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=23518&LangID=E.
[7]   Ibid.
[8]   Human Rights Council, "High Commissioner Bachelet calls on States to take strong action against inequalities", 6 March 2019. Available from
      https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=24265&LangID=E.
[9]   This report includes a section on historical background.
[10]  The Jammu and Kashmir region refers to the entire territory of the former princely state before 1947; in shorthand, this region is referred to as Kashmir in the report. There is no specific decision of a UN intergovernmental organ that clarifies which terminology should be used to describe the region of Kashmir. The Secretary-General's reports and letters have used the following terms: Kashmir, Jammu and Kashmir, State of Jammu and Kashmir, Indian administered side of the Line of Control in Jammu and Kashmir, and Pakistan Administered Kashmir. In a statement of 17 August 2016, the Secretary-General referred to Indian-administered Jammu and Kashmir. OHCHR refers in the report to the Indian state of Jammu and Kashmir, Azad Jammu and Kashmir and Gilgit-Baltistan. Where useful for clarity or brevity, OHCHR also uses Pakistan-Administered Kashmir and Indian-Administered Kashmir.
[11]  Indian citizens can request information from a public authority under the Right to Information Act 2005. It is applicable across India except the state of Jammu and Kashmir where a similar Act - 'Jammu and Kashmir Right to Information Act 2009' - is in force.
[12]  OHCHR considers the *Press Trust of India*—India's largest news agency and managed by an autonomous trust—as a reliable source to quote Indian authorities and official statements.

49.     As OHCHR has continued to be denied access to Kashmir, it was not possible to directly verify allegations. OHCHR bases its factual findings on the "reasonable grounds" standard of proof. This standard is met when a reliable body of information, consistent with other material, based on which a reasonable and ordinarily prudent person would have reason to believe that an incident or pattern of conduct had occurred.

50.     As noted in the 2018 report, the quantity and quality of information available on Indian-Administered Kashmir contrasts significantly to Pakistan-Administered Kashmir. Despite significant challenges, NGOs, human rights defenders and journalists are able to operate in the Indian state of Jammu and Kashmir, generating documentation on the ongoing human rights violations there. Restrictions on the freedoms of expression, opinion, peaceful assembly and association in Azad Jammu and Kashmir and Gilgit-Baltistan have limited the ability of observers, including OHCHR, to assess the human rights situation there. Nevertheless, OHCHR has sought to find reliable information on the human rights situation in Azad Jammu and Kashmir and Gilgit-Baltistan.

51.     In assessing the situation of human rights in Kashmir, OHCHR relied chiefly on the on the binding legal obligations that both India and Pakistan voluntarily assumed as State Parties to , as applicable, the International Covenant on Civil and Political Rights, the International Covenant on Economic, Social and Cultural Rights, the Convention on the Rights of the Child, the Convention on the Elimination of All Forms of Discrimination against Women, the International Convention on the Elimination of All Forms of Racial Discrimination, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,[13] as well as customary international law.

## IV.     Update on the political situation

52.     Since the release of the first report on the situation of human rights in Kashmir, the political coalition ruling the Indian state of Jammu and Kashmir disbanded and was replaced by direct federal rule, which is also known as Governor's rule.[14] On 21 November 2018, Governor Satya Pal Malik dissolved the state assembly and recommended fresh elections, stating he had done so in the "state's interest".[15]

53.     While India's general elections, including for six parliamentary seats in Jammu and Kashmir, took place in April-May 2019, no dates have been announced for the next state assembly elections.

54.     Political tensions peaked in Indian-Administered Kashmir after India's Supreme Court was petitioned to annul Article 35A of the Constitution of India,[16] which provides special powers to the Jammu and Kashmir legislative assembly to determine who is a permanent resident of the state.[17] The provision accords special rights and privileges to the citizens of the state of Jammu and Kashmir, in state public sector jobs, acquisition of property within the state, scholarships and other public aid and welfare programmes, and it bars people

---

[13]  India has signed but it has not ratified the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and the Convention for the Protection of all Persons from Enforced Disappearance, yet.

[14]  "President approves Governor's rule in J&K", *Press Trust of India*, 20 June 2018. Available from https://www.thehindubusinessline.com/news/national/president-approves-governors-rule-in-jk/article24206841.ece.

[15]  "Dissolved assembly in J&K's interest: Governor Satya Pal Malik", *Press Trust of India*, 22 November 2018. Available from https://timesofindia.indiatimes.com/india/dissolved-assembly-in-jks-interest-governor-satya-pal-malik/articleshow/66748058.cms.

[16]  Constitution of India, "The Constitution (Application to Jammu and Kashmir) Order, 1954", Appendix 1, p. 360. Available from https://www.india.gov.in/sites/upload_files/npi/files/coi_appendix.pdf.

[17]  "BJP Leader Moves SC Seeking Scrapping Of Article 35A", *LiveLaw*, 15 August 2018. Available from https://www.livelaw.in/bjp-leader-moves-sc-seeking-scrapping-of-article-35a-read-petition/.

from outside the state from acquiring any immovable property in the state.[18] Political groups across the spectrum in Indian-Administered Kashmir protested against any move to annul Article 35A.[19] The Government of Jammu and Kashmir filed a submission urging the Supreme Court to dismiss the petition, arguing that the issue had already been adjudicated previously by two different Constitutional benches.[20] The Union Government of India advised the Supreme Court to postpone any hearing until after January or March 2019 as it was a "very sensitive" issue.[21] The Supreme Court adjourned the hearing to March 2019,[22] and then has continued to postpone it.

55.     Elections for urban civic bodies and *Panchayats*[23] were conducted in multiple phases between October and December 2018 but were marred by threats, violence and boycotts. The Jammu and Kashmir People's Democratic Party (PDP) and the Jammu and Kashmir National Conference (NC) – the largest political parties of Jammu and Kashmir – boycotted the local civic body elections, on the basis that the situation was not favourable for elections and as a protest against attempts to annul Article 35A of the Constitution of India.[24] The two regional parties also boycotted *Panchayat* elections set for November-December 2018.[25] Armed groups operating in Indian-Administered Kashmir threatened anyone participating or voting in the elections with dire consequences.[26] Six party workers from two political parties were allegedly killed by armed groups in the campaigning phase of the local body elections. As a consequence, the voter turnout for Kashmir region was extremely low in comparison to the Jammu and Ladakh regions.[27]

---

[18] Ibid; Article 35A was inserted in the Constitution in 1954 by then President of India Rajendra Prasad on the advice of Prime Minister Jawaharlal Nehru's cabinet.

[19] "Separatists Call for Shutdown in Kashmir Ahead of SC Hearing on Article 35A", *Press Trust of India*, 5 August 2018. Available from https://www.thewire.in/law/kashmir-shutdown-article-35a; "Tinkering with Article 35A would undermine basic structure of Constitution: Mehbooba", *Press Trust of India*, 6 August 2018. Available from https://economictimes.indiatimes.com/news/politics-and-nation/tinkering-with-article-35a-would-undermine-basic-structure-of-constitution-mehbooba/articleshow/65295831.cms;
"BJP unleashing misinformation campaign over Article 35A: NC", *Press Trust of India*, 20 September 2018. Available from https://www.business-standard.com/article/pti-stories/bjp-unleashing-misinformation-campaign-over-article-35a-nc-118092000936_1.html.

[20] "Plea challenging Art. 35A filed by a 'meddlesome interloper' for publicity: State of J&K tells SC, Demands dismissal of petition", *LiveLaw*, 5 August 2018. Available from https://www.livelaw.in/plea-challenging-art-35a-filed-by-a-meddlesome-interloper-for-publicity-state-of-jk-tells-sc-demands-dismissal-of-petition-read-affidavit/.

[21] "Article 35A: Farooq criticizes ASG's stand in Supreme Court", *Press Trust of India*, 2 September 2018. Available from http://www.ptinews.com/news/10009321_Article-35A--Farooq-criticises-ASG--s-stand-in-Supreme-Court.

[22] "Supreme Court adjourns hearing on Article 35A to January 2019", *Press Trust of India*, 31 August 2018. Available from https://www.deccanchronicle.com/nation/current-affairs/310818/supreme-court-adjourns-hearing-on-article-35a-to-january-2019.html.

[23] Panchayat is a South Asian local body political system found in India, Pakistan, Nepal, Sri Lanka and Bangladesh.

[24] "After NC, PDP to boycott local body polls over Article 35A", *Press Trust of India*, 10 September 2018. Available from http://www.rediff.com/news/report/pdp-to-boycott-local-body-polls-over-article-35a/20180910.htm.

[25] "Despite NC, PDP's boycott, Centre likely to go ahead with panchayat polls in JK", *Press Trust of India*, 12 September 2018. Available from http://www.rediff.com/news/report/centre-likely-to-go-ahead-with-panchayat-polls-in-jk/20180912.htm.

[26] "LeT militant who threatened people against participating in polls held", *Press Trust of India*, 3 October 2018. Available from https://www.theweek.in/wire-updates/national/2018/10/03/des26-jk-polls-threat-arrest.html; "Jammu and Kashmir: Hizbul Mujahideen posters urging people to boycott panchayat elections surface in Doda", *Press Trust of India*, 5 November 2018. Available from https://www.dnaindia.com/india/report-jammu-and-kashmir-hizbul-mujahideen-posters-urging-people-to-boycott-panchayat-elections-surface-in-doda-2682803.

[27] "Jammu registers 78.6 per cent voter turnout, Kashmir 3.4 per in J&K municipal polls: Officials", *Press Trust of India*, 10 October 2018. Available from https://timesofindia.indiatimes.com/india/civic-polls-overwhelming-voter-turnout-in-jammu-dismal-in-kashmir-valley/articleshow/66152152.cms.

56.    In Pakistan-Administered Kashmir, a joint session of the Azad Jammu and Kashmir (AJK) Council and Azad Jammu and Kashmir Legislative Assembly passed the 13th Amendment to the Interim Constitution of Azad Jammu and Kashmir on 1 June 2018.[28] According to Pakistani authorities, this amendment will empower the Legislative Assembly by transferring most financial and administrative powers from the Council to the Assembly.[29] Pakistani authorities claim the amendment will also ensure that citizens of Azad Jammu and Kashmir enjoy the same fundamental rights as enshrined in the Constitution of Pakistan.[30] However, opposition parties and critics claim that the 13th amendment will in fact turn Azad Jammu and Kashmir into a province of Pakistan rather than maintaining its special status,[31] while experts and political activists are concerned that most of the key powers have been transferred to the Pakistani federal government, thereby further limiting the autonomy of the region's legislature and government.[32]

57.    Similarly, Pakistani authorities have also issued some reforms in Gilgit-Baltistan. The Legislative Assembly in this region has been renamed as the Gilgit-Baltistan Assembly and the Chief Court of Gilgit-Baltistan has been renamed as the Gilgit-Baltistan High Court.[33] However, civil society representatives in Gilgit-Baltistan believe these are nominal changes, which do not devolve real power or provide better protection for people as part of Gilgit-Baltistan Reforms Order 2018.[34]

58.    Tensions between India and Pakistan escalated after the 14 February 2019 suicide bombing in Pulwama, when a vehicle borne improvised explosive device struck a convoy of Indian security forces, killing 40 soldiers of the Central Reserve Police Force, which is a federal paramilitary unit widely deployed in Indian-Administered Kashmir. Both the United Nations Secretary-General and the High Commissioner for Human Rights strongly condemned the attack.[35] Pakistan-based Jaish-e-Mohammed[36] claimed responsibility for the attack.[37] India blamed Pakistan for supporting Jaish-e-Mohammed's activities.[38] Pakistan rejected this allegation and asked India to provide "actionable evidence" about the involvement of any Pakistani national.[39] India claimed that it had provided all necessary information and intelligence.

---

[28]    AJK Legislative Assembly, LD/Legis-Act/37-52/2018, 1 June 2018. Available from http://www.ajkassembly.gok.pk/Notification%20Pdf%2013th%20Constitutional%20Amendment%20 02-06-2018(1).pdf

[29]    "13th amendment in interim constitution will empower AJKLA: Farhat", *Radio Pakistan*, 5 July 2018. Available from http://www.radio.gov.pk/05-07-2018/13th-amendment-in-interim-constitution-will-empower-ajkla-farhat.

[30]    Ibid.

[31]    "Who rules Azad Jammu and Kashmir?" Jalaluddin Mughal, 17 August 2018. Available from https://www.thefridaytimes.com/tft/who-rules-azad-jammu-and-kashmir/.

[32]    "Who rules Azad Jammu and Kashmir?" Jalaluddin Mughal; L210.

[33]    "Govt approves GB reforms, delegates more powers", *Radio Pakistan*, 22 May 2018. Available from http://www.radio.gov.pk/21-05-2018/federal-govt-approves-gb-reforms-delegating-more-powers-to-its-government,

[34]    "Gilgit-Baltistan Order 2018: A Copy-Paste Bureaucratic Endeavor", *Pamir Times*, 5 June 2018. Available from https://pamirtimes.net/2018/06/05/gilgit-baltistan-order-2018-a-copy-paste-bureaucratic-endeavor/.

[35]    https://www.un.org/press/en/2019/sgsm19466.doc.htm, and https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=24179&LangID=E.

[36]    Jaish-e-Mohammed is listed on the UN Security Council's Al-Qaeda and ISIL sanctions list and is known to be based in Pakistan. (UN Security Council, Jaish-i-Mohammed profile. Available from https://www.un.org/securitycouncil/sanctions/1267/aq_sanctions_list/summaries/entity/jaish-i-mohammed.)

[37]    "Profile: What is Jaish-e-Muhammad?" Al Jazeera, 15 February 2019. Available from https://www.aljazeera.com/news/2019/02/profile-jaish-muhammad-190215061851082.html.

[38]    India, Ministry of External Affairs, 14 February 2019. Available from https://www.mea.gov.in/press-releases.htm?dtl/31053/India_strongly_condemns_the_cowardly_terrorist_attack_on_our_security_fo rces_in_Pulwama_Jammu_amp_Kashmir.

[39]    Statement by Pakistan Prime Minister Imran Khan, 20 February 2019. Available from http://www.mofa.gov.pk/pr-details.php.

59.     On 26 February 2019, India claimed its air force had bombed a Jaish-e-Mohammed training camp in Balakot, Pakistan and killed "a very large number of Jaish-e-Mohammed terrorists, trainers, senior commanders and groups of jihadis who were being trained for fidayeen action".[40] Pakistan protested this action as a violation of its "sovereignty and territorial integrity" and claimed Indian jets had randomly released their ordinance in an "uninhabited remote area" under pressure from Pakistan combat jets.[41]

60.     On 27 February 2019, Pakistan claimed its air force had struck "across the Line of Control from within Pakistani airspace".[42] In the ensuing battle between Indian and Pakistani air forces, one Indian pilot was captured by Pakistani forces after he was forced to bail out of his aircraft in Pakistan-Administered Kashmir.[43] Pakistan released the captured pilot on 1 March 2019.[44] While direct military tensions de-escalated after this incident, sporadic cross-border shelling and firing by both sides continued through February and March.

# V.     Human rights violations in Indian-Administered Kashmir

## A.     Civilian killings and excessive use of force

61.     According to the Jammu and Kashmir Coalition of Civil Society (JKCCS), around 160 civilians were killed in 2018, which is believed to be the highest number in over one decade.[45] Last year also registered the highest number of conflict-related casualties since 2008 with 586 people killed including 267 members of armed groups and 159 security forces personnel.[46] According to JKCCS, 1,081 civilians have been killed by security forces in extrajudicial killings between 2008 and 2018.[47]

62.     However, the Union Ministry for Home Affairs claimed only 37 civilians, 238 terrorists and 86 security forces personnel were killed in 2018 up to 2 December 2018.[48]

63.     According to JKCCS, of the 160 civilians reportedly killed in 2018, 71 were allegedly killed by Indian security forces, 43 were killed by armed group members or unidentified gunmen and 29 were killed by shelling and firing by Pakistani troops in areas along the Line of Control.[49] The Kashmir Valley, where most of the protests and armed encounters are reported to have taken place, accounted for 122 of these civilian killings.[50] The 4 districts of South Kashmir – Pulwama, Kulgam, Shopian and Anantnag – recorded 85 of the 122 civilian killings in 2018.[51]

---

[40] Statement by Indian Foreign Secretary Vijay Gokhale, 26 February 2019. Available from https://www.mea.gov.in/press-releases.htm?dtl/31091/Statement_by_Foreign_Secretary_on_26_February_2019_on_the_Strike_on_JeM_training_camp_at_Balakot.

[41] Pakistan, Ministry of Foreign Affairs, 26 February 2019. Available from http://www.mofa.gov.pk/pr-details.php.

[42] Pakistan, Ministry of Foreign Affairs, 27 February 2019. Available from http://www.mofa.gov.pk/pr-details.php.

[43] "Abhinandan: Who is the Indian pilot captured by Pakistan?", *BBC*, 1 March 2019. Available from https://www.bbc.com/news/world-asia-india-47397409.

[44] Pakistan, Ministry of Foreign Affairs, 1 March 2019. Available from http://www.mofa.gov.pk/pr-details.php.

[45] Jammu Kashmir Coalition of Civil Society, "Annual Human Rights Review 2018", p. 4. Available from http://jkccs.net/wp-content/uploads/2018/12/Annual-Report-2018.pdf.

[46] Ibid.

[47] Ibid, p. 8.

[48] Government of India, "Year End Review 2018-Ministry of Home Affairs", 14 December 2018. Available from http://pib.nic.in/newsite/PrintRelease.aspx?relid=186405.

[49] JKCCS, "Annual Human Rights Review 2018", p. 8.

[50] Ibid, p.9.

[51] Ibid.

64. In the first 3 months of 2019, 21 civilians were reportedly killed by various perpetrators including armed groups, unknown gunmen, Indian security forces and cross-border shelling by Pakistani security forces along the Line of Control; 3 civilians were killed by the armed forces while 4 died in grenade or improvised explosive device (IED) explosions.[52] According to JKCCS, a total of 162 conflict-related casualties were recorded between January and March 2019, including 83 Indian security forces personnel and 58 armed group members.[53]

65. In comparison, between July 2016 and March 2018, OHCHR reported around 165 civilian killings by Indian security forces and armed groups in Indian-Administered Kashmir.[54]

66. Civil society groups believe that a majority of the civilian killings recorded in 2018 were due to excessive use of force by Indian security forces against civilians.[55] This is similar to the pattern found by OHCHR from July 2016 to March 2018.[56]

67. Similar to 2017, a majority of the killings reported in 2018 took place around sites of armed encounters between security forces and armed group members. While some of the civilians killed were protesters who may have been throwing rocks at security forces to help armed group members escape, there have been several cases of bystanders or civilians situated far from "encounter sites". As in the past, security forces allegedly used live ammunition and pellet-firing shotguns to disperse such protesters resulting in serious injuries and deaths.

68. For instance, on 5 May 2018, security forces allegedly killed five civilians and injured dozens of others after protests broke out near an encounter site where five members of the banned Hizbul Mujahideen were killed in a gunfight.[57] The five civilians, including a minor, were allegedly shot dead by security forces in their action against the protesters.[58]

69. In another incident on 15 December 2018, seven civilians were reportedly killed near the site of an armed encounter in Pulwama district of South Kashmir where Indian security forces carried out actions in which three armed group members were killed.[59] The seven civilians, including three minors, were killed when security forces allegedly opened fire on protesters who confronted them after the armed encounter ended.[60] In 2018, at least 39 civilians, including 11 minors, were killed near armed encounter sites in the Kashmir Valley allegedly due to excessive use of force against protesters.[61]

70. Despite the high number of civilians being killed near encounter sites in 2018, there is no information about any new investigation into excessive use of force leading to casualties. There is no information on the status of the five investigations launched into

---

[52] JKCCS, "Quarterly review of the human rights situation in Indian administered Jammu and Kashmir (January to March 2019)", 1 April 2019, p. 2. Available from http://jkccs.net/quarterly-hr-review-jan-mar-2019/.

[53] Ibid.

[54] 130 to 145 civilians killed by security forces and 16 to 20 killed by armed groups. (See OHCHR,"Report on the Situation of Human Rights in Kashmir: Developments in the Indian State of Jammu and Kashmir from June 2016 to April 2018, and General Human Rights Concerns in Azad Jammu and Kashmir and Gilgit-Baltistan", para 64).

[55] H137.

[56] OHCHR, "Report on the Situation of Human Rights in Kashmir", paras 63-78.

[57] "JK: 5 Hizbul terrorists killed in encounter; 5 civilians die in clashes", Press Trust of India, 6 May 2018. Available from https://www.indiatoday.in/pti-feed/story/jk-5-hizbul-terrorists-killed-in-encounter-5-civilians-die-in-clashes-1227728-2018-05-06.

[58] Submission made to the UN Special Rapporteur on extrajudicial, summary or arbitrary execution.

[59] "7 civilians among 11 killed in encounter, protests in Kashmir", Press Trust of India, 15 December 2018. Available from http://www.ptinews.com/news/10246449_7-civilians-among-11-killed-in-encounter--protests-in-J-amp-K--s-Pulwama.

[60] Ibid.

[61] Ibid.

extrajudicial executions in 2016.[62] The Indian state of Jammu and Kashmir did not establish any investigations into civilian killings in 2017.[63] No prosecutions have been reported. It does not appear that Indian security forces have been asked to re-evaluate or change their crowd-control techniques or rules of engagement.

71.     Through several official communications addressed to the Government of India, the United Nations Special Rapporteur on extrajudicial, summary or arbitrary executions has raised concerns about the alleged violations of the right to life in Jammu and Kashmir, especially since the 2016 unrest began.[64] Since January 2018, the Special Rapporteur has sent three communications to India expressing concerns about "intentional, excessive or indiscriminate use of firearms" by Indian security forces and the failure to conduct "thorough, prompt and impartial investigations" into these cases in order to uphold rule of law and to ensure non-reoccurrence of the violations.[65] In her 18 March 2019 communication, the Special Rapporteur also raised the killing of five people by "militants or unknown individuals".[66]

72.     Taking note of OHCHR's June 2018 report, a number of United Nations Special Rapporteurs issued a joint communication in which they noted: "We regret that, from the information received, it does not appear that efforts have been made to implement the recommendations, including in relation to the repeal the Armed Forces (Jammu and Kashmir) Special Powers Act, 1990; to establish independent, impartial and credible investigations to probe all civilian killings which have occurred since July 2016; to investigate all deaths that have occurred in the context of security operations in Jammu and Kashmir following the guidelines laid down by the Supreme Court of India; and to investigate all cases of abuses committed by armed groups in Jammu and Kashmir, including the killings of minority Kashmiri Hindus since the late 1980s."[67]

73.     In its response to the joint communication, the Government of India responded to this letter with a written reply saying that it took "serious objection" to the mandate holders referencing OHCHR's June 2018 report and would no longer engage with any mandate holder on this issue.[68]

74.     Under article 6 of the International Covenant on Civil and Political Rights, States parties are expected to take all necessary measures intended to prevent arbitrary deprivations of life by their law enforcement officials, including soldiers charged with law enforcement missions. In particular, all operations of law enforcement officials should comply with relevant international standards, including the Code of Conduct for Law Enforcement

---

[62] In January 2018, the state government of Jammu and Kashmir informed the state assembly that five inquiries had been established to review the killing of civilians in 2016 (Jammu and Kashmir Legislative Assembly, Unstarred A.Q. No.123. 23 January 2018, p. 2. Available from http://www.jklegislativeassembly.nic.in/replies2018/23JAN18/A.Q.NO.123%20001.pdf.)

[63] Ibid.

[64] AL IND 8/2019 (*https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=24476*) ; AL IND 25/2018 (https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=24205(; AL IND 9/2018 (https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=23799); AL IND 10/2017 (https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=23332); AL IND 5/2016 (https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=3282).

[65] AL IND 8/2019; AL IND 25/2018; AL IND 9/2018.

[66] Joint Communication, Mandates of the Special Rapporteur on extrajudicial, summary or arbitrary executions; the Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health; the Special Rapporteur on torture and other cruel, inhuman or degrading tremament of punishment (IND 8/2019), 18 March 2019, p. 1. Available from

[67] Ibid, p.4.

[68] India, Note Verbale GEN/PMI/353/05/2019, 23 April 2019. Available from https://spcommreports.ohchr.org/TMResultsBase/DownLoadFile?gId=34631.

Officials (General Assembly resolution 34/169)(1979) and the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials (1990). States parties are also obliged to carry out ex officio an independent, impartial, prompt, thorough, effective, credible and transparent investigation concerning the circumstances of potentially unlawful deprivations of life, and when appropriate, bring the perpetrators to justice. In the event that a violation is found, full reparation must be provided to the victims, including, adequate measures of compensation, rehabilitation and satisfaction.[69]

75.     According to JKCCS, on 15 December 2018, Indian security forces used four civilians as human shields during a gunfight with armed group members in Pulwama district.[70] One of the civilians said that they were ordered to remove logs scattered in an orchard to find the exact hideout of suspected armed group members.[71] Seven civilians and three armed group members were killed in this armed encounter.[72]

## B.     Continued use of pellet-firing shotgun

76.     Indian security forces continue to use pellet-firing shotguns in the Kashmir Valley as a crowd-control weapon despite concerns as to excessive use of force and the large number of incidental civilian deaths and injuries that have resulted. It should be noted that this weapon is not deployed elsewhere in India. As noted in OHCHR's June 2018 report, the 12-gauge pump-action shotgun firing metal pellets is one of the most dangerous weapons used in Kashmir.[73]

77.     On 16 June 2018, a civilian was killed in Anantnag district of South Kashmir after being hit by metal pellets fired by security forces at protesters returning from Eid prayers.[74] The deceased had pellet wounds in his neck and throat.[75] In another incident a 19-month-old girl was hit by the metal pellets in her right eye on 25 November 2018.[76] The metal pellets were successfully removed from her eye but doctors were unsure whether she would regain her eyesight completely.[77]

78.     According to information from Srinagar's Shri Maharaja Hari Singh Hospital, where most pellet shotgun injured are treated, 1,253 people have been blinded by the metal pellets used by security forces from mid-2016 to end of 2018.[78]

79.     In compliance with the right to life, law enforcement officials, including soldiers charged with law enforcement missions, can only employ "less-lethal" weapons, subject to strict requirements of necessity and proportionality, in situations in which other less harmful measures have proven to be, or clearly are ineffective to address the threat. "Less-lethal" weapons should be used in situations of crowd control which can be addressed through less

---

[69]  Human Rights Committee, General Comment 36, Article 6, Right to life, CCPR/C/GC/36, 30 October 2018, paras 13, 27-28.

[70]  JKCCS, "Torture: Indian state's instrument of control in Indian-administered Jammu and Kashmir", p.66.

[71]  Ibid.

[72]  Ibid.

[73]  OHCHR, "Report on the Situation of Human Rights in Kashmir", paras 79-85.

[74]  JKCCS, "Annual Human Rights Review 2018", p.10; "Youth killed, 20 others injured in Kashmir in clashes after Eid prayers", *Press Trust of India*, 16 June 2018. Available from https://www.tribuneindia.com/news/jammu-kashmir/youth-killed-20-others-injured-in-kashmir-in-clashes-after-eid-prayers/606261.html.

[75]  "Youth killed, 20 others injured in Kashmir in clashes after Eid prayers", *Press Trust of India*.

[76]  "Doctors unsure if Kashmir's youngest pellet victim will regain complete sight", *Press Trust of India*, 28 November 2018. Available from https://www.hindustantimes.com/india-news/doctors-unsure-if-kashmir-s-youngest-pellet-victim-will-regain-complete-sight/story-x1wBWNCWMU8iAT6ohwkZVl.html.

[77]  Ibid.

[78]  JKCCS, "Annual Human Rights Review 2018", p.10.

harmful means, especially situations involving the exercise of the right to peaceful assembly.[79]

## C. Cordon and Search Operations

80. So-called "cordon and search operations", a much-criticized military strategy employed by the Indian security forces in the early 1990s, was reintroduced in the Kashmir Valley in 2017.[80] During the peak of armed insurgency in the 1990s, most extrajudicial killings were associated with cordon and search operations.[81] Typically in a cordon and search operation, security forces order all the men of a neighbourhood to come out and assemble for an "identification parade in front of hooded informers".[82]

81. According to national and international human rights organizations, cordon and search operations enable a range of human rights violations, including physical intimidation and assault, invasion of privacy, arbitrary and unlawful detention, collective punishment and destruction of private property.[83] In a September 2018 statement, the Organisation of Islamic Cooperation contact group on Jammu and Kashmir expressed "grave concern over the cordon and search operations in which Kashmir youth are being targeted with impunity".[84]

82. In 2018, civilian deaths were also reported due to excessive use of force during cordon and search operations.[85] On 22 June 2018, a 55-year-old man, Mohammed Yousuf Rather, was allegedly shot when security forces entered his home in Nowshehra village of Anantnag district as part of a local operation.[86] He died before reaching the hospital.[87] On 26 September 2018, a 24-year-old man, Mohammed Saleem Malik, was killed during a cordon and search operation near his house in Srinagar's Noorbagh area.[88]

83. JKCCS also recorded 120 cases of destruction of civilian property during cordon and search operations in 2018 including 31 private houses being completely burnt down.[89] Another 18 cases of destruction of civilian property were reported in the first 3 months of 2019.[90] Persons affected have complained that they have not received any compensation.[91]

---

[79] Human Rights Committee, General Comment 36, para. 14. See also Article 3, United Nations Code of Conduct for Law Enforcement Officials, 17 December 1979. Available from https://www.ohchr.org/en/professionalinterest/pages/lawenforcementofficials.aspx; and United Nations Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, 7 September 1990. Available from https://www.ohchr.org/en/professionalinterest/pages/useofforceandfirearms.aspx.

[80] JKCCS, "Annual Human Rights Review 2018", pp.10-11.

[81] Human Rights Watch (HRW), "India's Secret Army in Kashmir: New Patterns of Abuse Emerge in the Conflict", 1 May 1996. Available from https://www.hrw.org/legacy/reports/1996/India2.htm#P46_795.

[82] HRW, "The human rights crisis in Kashmir", June 1993, p.13. Available from https://www.hrw.org/sites/default/files/reports/INDIA937.PDF.

[83] HRW, "The human rights crisis in Kashmir", p.14; JKCCS, "Annual Human Rights Review 2018", pp.11-15.

[84] Organisation of Islamic Cooperation, "Declaration on the Jammu and Kashmir Dispute", September 2018. Available from https://www.oic-oci.org/docdown/?docID=3352&refID=1167.

[85] JKCCS, "Annual Human Rights Review 2018", p.11.

[86] Submission made to the UN Special Rapporteur on extrajudicial, summary or arbitrary execution.

[87] Ibid.

[88] "Yaseen Malik, Mirwaiz Moulvi released, no relief for Syed Ali Shah Geelani", *United News of India*, 29 September 2018. Available from http://www.newindianexpress.com/nation/2018/sep/29/yaseen-malik-mirwaiz-moulvi-released-no-relief-for-syed-ali-shah-geelani-1878764.html.

[89] JKCCS, "Annual Human Rights Review 2018", pp.11-15.

[90] JKCCS, "Quarterly review..(January to March 2019)", pp 3-4.

[91] H137.

## D.    Arbitrary detention

84.    Authorities in Indian-Administered Kashmir continue to use various forms of arbitrary detention to target protesters, political dissidents and other civil society actors. A number of laws in Jammu and Kashmir provide the legal basis for arbitrary detention, but the one that is used most frequently to stifle protests and political dissent is the Jammu and Kashmir Public Safety Act (PSA) 1978.[92] The PSA does not provide for a judicial review of detention,[93] and state authorities have defied orders by the Jammu and Kashmir High Court to release people detained under this law by issuing successive detention orders.[94] This practice has been used to keep people arbitrarily in detention for several weeks, months, and, in some cases, years.[95] The Supreme Court of India has described the system of administrative detention, including PSA, as a "lawless law".[96]

85.    Pro-independence[97] leader Masrat Alam, who was first detained under the PSA in 2010, was charged for the 37th time in November 2018.[98] He was re-arrested under the PSA in apparent contravention of the Supreme Court's orders that any new detention order against him would not come into effect for a week to help him prepare his legal defence.[99] Despite being repeatedly detained under the PSA, Masarat Alam has never been convicted of any charges.[100] Several separatist political leaders were detained under PSA in 2018 and 2019 and continue to be imprisoned.[101]

86.    In July 2018, the Government of Jammu and Kashmir amended section 10 of the PSA, removing the prohibition on detaining permanent residents of Jammu and Kashmir[102] outside the state.[103] At least 40 people, chiefly separatist political leaders charged under the PSA were transferred to prisons outside the state of Jammu and Kashmir in 2018.[104] There are fears that the Government's decision to transfer PSA detainees outside Jammu and Kashmir is a way to punish the detainees further, as this makes it harder for them to be visited by their

---

[92]  The PSA authorizes the authorities to impose an administrative detention order for a broad range of activities that are vaguely defined, including "acting in any manner prejudicial to the security of the State" or for "acting in any manner prejudicial to the maintenance of public order". PSA allows for detention without charge or trial for up to two years in some cases. (India, Jammu and Kashmir Public Safety Act, 1978. Available from http://jkhome.nic.in/PSA0001.pdf). See also JKCCS, "Annual Human Rights Review 2018", pp. 15-19.

[93]  Human Rights Watch, International Commission of Jurists and Amnesty International, "Cease Wrongful Detention in Jammu and Kashmir", 15 October 2016. Available from https://www.hrw.org/news/2016/10/15/india-cease-wrongful-detentions-jammu-and-kashmir.

[94]  Amnesty International, "A Lawless Law", 21 March 2011, pp. 58-59. Available from https://www.amnesty.org/en/documents/ASA20/001/2011/en/.

[95]  L177; L181.

[96]  Supreme Court of India, Jaya Mala v. Home Secretary, Government of Jammu & Kashmir (29 July 1982). Available from https://indiankanoon.org/doc/203168/.

[97]  In this report, OHCHR uses the terms separatist and pro-independence interchangeably. In Indian-Administered Kashmir, separatist and pro-independence refer to those who call for Kashmir to be independent from both India and Pakistan and to those who call for Kashmir's accession to Pakistan. In Pakistan-Administered Kashmir, pro-independence refers to those who call for Kashmir to be independent of both Pakistan and India.

[98]  JKCCS, "Annual Human Rights Review 2018", p.15.

[99]  L177; JKCCS, "Annual Human Rights Review 2018", p.15; "Alam release: J-K home department letter stokes fresh row", Press Trust of India, 10 March 2015. Available from https://www.hindustantimes.com/india/alam-release-j-k-home-department-letter-stokes-fresh-row/story-URjfcqHMx9ss7ZRbc8nalP.html.

[100]  JKCCS, "Annual Human Rights Review 2018", p.15.

[101]  Ibid.

[102]  The Constitution of Jammu and Kashmir, 1956 defines who is a permanent resident of the state of Jammu and Kashmir, and Article 35A of the Constitution of India provides preferential rights to such permanent residents.

[103]  India, Jammu and Kashmir Public Safety Act (Amendment) Act, 2018, 13 July 2018. Available from http://jklaw.nic.in/pdf/Public%20Saftey.pdf.

[104]  JKCCS, "Annual Human Rights Review 2018", p.15.

family members or to meet with their legal counsel. [105] In relation to this, some prisons even deny lawyers permission to meet their clients without special court orders. [106] Prisons outside Jammu and Kashmir are also considered hostile for Kashmiri Muslims detainees, especially separatist leaders, as they are treated as "terror suspects". [107]

87.     While protesters throwing stones or separatist leaders are usually held initially for three months as a form of preventive detention, authorities extend their detention for three months at a time without producing any new evidence substantiating grounds for their continued detention. [108]

88.     The state government is obligated under the Jammu and Kashmir Right to Information Act 2009 to publicly provide "detailed reasons, facts and materials that form the basis of this amendment". [109] However, Jammu and Kashmir authorities have not provided any details on why section 10 of the PSA was amended to allow the transfer of detainees to prisons outside Jammu and Kashmir.

89.     A right to information (RTI) inquiry revealed that while the PSA Advisory Board [110] confirmed almost 99 percent of the detention orders, the Jammu and Kashmir High Court reversed over 81 percent of these detention orders. [111] In May 2018, the State Government further diluted the checks and balances in the application of the PSA by removing the need to consult Jammu and Kashmir High Court Chief Justice while constituting the Advisory Board. [112]

90.     OHCHR was informed that despite the Jammu and Kashmir High Court setting aside numerous PSA detention orders, the Jammu and Kashmir authorities continue to detain people by imposing new PSA orders even before suspects leave prisons. [113]

91.     The United Nations Treaty Bodies and Special Procedures have called on India to amend the PSA to ensure it complies with its international human rights obligations. [114] The Human Rights Committee has noted that the PSA contravenes the rights enshrined in the International Covenant on Civil and Political Rights, especially the rights to liberty and to a free and fair trial. [115] While analyzing several cases of arbitrary detention under the PSA, the Working Group on Arbitrary Detention observed that, "[the] Government has not refuted the allegation that these persons were detained by security forces under the said Act without serving them with an arrest warrant, which constitutes a violation of due process in detention." [116]

---

[105]  Ibid.
[106]  L117; L181.
[107]  Ibid.
[108]  Ibid.
[109]  Commonwealth Human Rights Initiative (CHRI), "RTI reveals advisory board under J&K Public Safety Act spent 75% of its budget upholding detention orders which J&K High Court quashed later on", 2 August 2018. Available from http://www.humanrightsinitiative.org/blog/rti-reveals-advisory-board-under-jk-public-safety-act-spent-75-of-its-budget-upholding-detention-orders-which-jk-high-court-quashed-later-on.
[110]  Formerly under Section 14 of the Jammu and Kashmir PSA Act (1978), the Advisory Board examines the correctness of every detention order issued by the competent authority. Based on proof provided to this board, it can confirm or revoke a detention order and this would be binding on the state.
[111]  CHRI, "RTI reveals advisory board under J&K Public Safety Act spent 75% of its budget upholding detention orders which J&K High Court quashed later on".
[112]  Ibid; India, Jammu and Kashmir (Preventive Detention Laws) Order, 2018, 22 May 2018. Available from http://jklaw.nic.in/pdf/preanative%20decation%20.pdf.
[113]  L117; L181.
[114]  Concluding Observations of the Human Rights Committee (CCPR/C/79/Add.81), 4 August 1997, para 18; Opinion adopted by the Working Group on Arbitrary Detention (A/HRC/13/30/Add.1), 4 March 2010, para 51; Report of the Special Rapporteur on the situation of human rights defender, Margaret Sekaggya (A/HRC/19/55/Add.1), 6 February 2012, para 145.
[115]  CCPR/C/79/Add.81, para 18.
[116]  A/HRC/13/30/Add.1, para 42

92.     As a State Party to the International Covenant on Civil and Political Rights, India is obligated to ensure the principles of legality[117] and the right to liberty and security.[118] The right to liberty and security includes the right not to be subjected to arbitrary arrest or detention,[119] the right to know the reasons for one's detention and charges, if any,[120] the right to be brought before a judge within a reasonable time following arrest or detention, and the right to appeal to a court of law to review the arrest or detention.[121] Where persons detained under the PSA have been transferred outside Jammu and Kashmir, the authorities are also obligated to guarantee them, "adequate time and facilities for the preparation of ... [a] defence and to communicate with counsel of...[their] own choosing."[122]

93.     As noted in the OHCHR's June 2018 report, the Human Rights Committee raised concerns in relation to the system of administrative detention in India and made recommendations which have yet to be fully implemented.[123] Likewise, although in 2014 the Committee on the Rights of the Child recommended India that all persons under the age of 18 be handled by the juvenile justice system in all circumstances, and that age verification procedures be consistently and effectively applied, [124] information received by OHCHR indicates that there have been cases of children under 18 years being detained under the PSA in 2018 and 2019.[125] OHCHR was informed that there are several cases where children under the age of 18 were being held in police station lock-ups for several days without charge and were being mistreated,[126] even being required to pay for their meals.[127]

94.     In February 2019, the Jammu and Kashmir High Court rescinded an order of the Jammu and Kashmir Director General of Police (Prisons) that sought to shift an "under trial"[128] prisoner outside the state.[129] The High Court established that the state was unable to demonstrate that the transfer (of the detainee) was done to meet any administrative exigency or emergency.[130] However, observers have expressed skepticism that this decision will stop the transfer of PSA detainees outside of Jammu and Kashmir.[131]

## E.     Impunity for human rights violations

95.     Indian authorities have made no attempt to address serious concerns about access to justice and impunity for human rights violations committed in Jammu and Kashmir. The Armed Forces (Jammu and Kashmir) Special Powers Act 1990 (AFSPA) remains a key obstacle to accountability.[132] As described in the June 2018 OHCHR report, this Act grants

---

[117]   Article 15(1), International Covenant on Civil and Political Rights.

[118]   Article 9, International Covenant on Civil and Political Rights.

[119]   Article 9(1), International Covenant on Civil and Political Rights.

[120]   Article 9(2), International Covenant on Civil and Political Rights.

[121]   Article 9(4), International Covenant on Civil and Political Rights.

[122]   Article 14(3), International Covenant on Civil and Political Rights.

[123]   CCPR/C/79/Add.81, para 24. See also OHCHR, "Report on the Situation of Human Rights in Kashmir", paras 86-87.

[124]   CRC/C/OPAC/IND/CO/1, Concluding observations on the report submitted by India under article 8, paragraph 1, of the Optional Protocol to the Convention on the Rights of the Child on the involvement of children in armed conflict. Available from http://tbinternet.ohchr.org/_layouts/treatybodyexternal/Download.aspx?symbolno=CRC/C/OPAC/IND/CO/1&Lang=En. See also OHCHR "Report on the Situation of Human Rights in Kashmir", para. 91.

[125]   L117; L181.

[126]   Ibid.

[127]   Ibid.

[128]   In India, the term undertrial is used to describe people who were awaiting trial or whose trials were still ongoing, and who have not been convicted.

[129]   High Court of Jammu and Kashmir at Srinagar, HCP No 178/2018, Abdul Wahid Mir v State of J&K, 12 February 2019.

[130]   Ibid.

[131]   L117; L181.

[132]   Armed Forces (Jammu and Kashmir) Special Powers Act, 1990 was passed by the Parliament of India on 10 September 1990 but was "deemed to have come into force" retrospectively from 5 July 1990.

broad powers to the security forces operating in Jammu and Kashmir and effectively bestows immunity on security forces from prosecution in civilian courts for their conduct, by requiring the Central Government to sanction all prospective prosecutions against such personnel.

96.     Section 7 of the AFSPA prohibits the prosecution of security forces personnel unless the Government of India grants a prior permission or "sanction" to prosecute. In nearly three decades that the law has been in force in Jammu and Kashmir, there has not been a single prosecution of armed forces personnel granted by the central government.[133] Moreover, the Indian Army has used section 7 to block prosecution of its personnel even by independent federal investigation agencies.[134]

97.     Despite repeated calls from national and international human rights experts to repeal the AFSPA,[135] Indian authorities have given no indication that this law will be repealed or amended in Jammu and Kashmir.

98.     Despite allegations of serious human rights violations committed by the Indian security forces, especially in the 1990s and early 2000s, Indian authorities have consistently undermined efforts to hold members of security forces accountable. As of 1 May 2019, it does not appear that Indian authorities have changed their approach in addressing charges of impunity enjoyed by the security forces.

99.     A staged or "fake encounter"[136] near the Pathribal village in the Anantnag district of Jammu and Kashmir in March 2000 illustrates the means that have been used to ensure impunity for security forces until now. On 25 March 2000, the authorities announced that in the context of a joint operation, the Indian Army and the Jammu and Kashmir Police had killed five allegedly foreign members of an armed group in a gunfight near Pathribal. The authorities claimed that the five had been responsible for the killing of 35 Sikh villagers in Chittisinghpura village of Anantnag district on 20 March 2000.  However, days later, family members of the five claimed that they were not foreign fighters but were ordinary villagers who had been forcibly taken away by the 7 Rashtriya Rifles unit and later killed in a staged encounter in Pathribal.[137] Pressured by widespread civilian protests, the state government of

---

(India, Armed Force (Jammu and Kashmir) Special Powers Act, 1990. Available from http://www.mha.nic.in/hindi/sites/upload_files/mhahindi/files/pdf/Armedforces_J&K_Spl.powersact1990.pdf.)

[133] On 1 January 2018, the Union Ministry of Defence informed the upper house of the Indian Parliament that it had received 50 requests for sanction for prosecution from the Government of Jammu and Kashmir since AFSPA 1990 came into force. Sanction requests in 47 cases were rejected and are pending in 3 cases (Parliament of India, Rajya Sabha, Unstarred question no. 1463. Available from http://rajyasabha.nic.in/)

[134] Indian Army used AFSPA to block the prosecution of their personnel in the 1994 Dangari fake encounter case from Assam and in the 2000 Pathribal fake encounter case from Jammu and Kashmir. Both cases were investigated by the Central Bureau of Investigation. (See "Don't celebrate Army's Dangari court martial, it gives a false sense of closure", *Lt General (retired) H.S. Panag*, 25 October 2018. Available from https://theprint.in/opinion/dont-celebrate-armys-dangari-court-martial-it-gives-a-false-sense-of-closure/139631/; "Denied: Failures in accountability for human rights violations by security force personnel in Jammu and Kashmir", 2015, pp 36-37. Available from https://www.amnesty.org/download/Documents/ASA2018742015ENGLISH.PDF)

[135] At least two judicial committees set up by Indian authorities (Justice Jeevan Reddy Committee and Justice Santosh Hegde Committee) have called for repeal of AFSPA from Jammu and Kashmir and several states in Northeast India. United Nations Special Rapporteurs on extrajudicial, summary or arbitrary executions and on violence against women, its causes and consequences also called for the repeal of AFSPA during their respective India country visits in 2012 and 2013.

[136] "Fake encounters" entail that suspected criminals or persons alleged to be terrorists or insurgents, and in some cases individuals for whose apprehension an award is granted, are fatally shot by the security officers. A "shootout scene" is staged afterwards to portray those killed as the aggressors who had first opened fire. The security officers allege in this regard that they returned fire in self-defence. (Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Christof Heyns, Mission to India (A/HRC/23/47/Add.1.), 26 April 2013, para 17.)

[137] Testimonies given to Amnesty International by family members of the five killed in the Pathribal staged encounter. Available from http://brokenfamilies.in; Amnesty International, "Denied", 2015, pp 36-37; HRW, "'Everyone Lives in Fear': Patterns of Impunity in Jammu and Kashmir",

Jammu and Kashmir ordered the exhumation of the bodies for forensic analysis and DNA testing.[138] DNA testing revealed that the five men killed were not foreign armed group members as claimed by the security forces but that they were civilians from villages around Pathribal.[139] Jammu and Kashmir Chief Minister Farooq Abdullah called for an independent investigation into the incident by the Central Bureau of Investigation (CBI), a federal agency.

100.   On 11 May 2006, the CBI filed murder charges against five serving army personnel from the 7 Rashtriya Rifles unit in the court of the Chief Judicial Magistrate of Srinagar.[140] The CBI argued this was a case of "cold blooded murder" and were not actions take in the course of performing official duties, and so the perpetrators could not be protected under section 197(2) of the Criminal Procedure Code, which similar to section 7 of the AFSPA necessitates the Central Government's prior sanction to prosecute personnel of any central armed forces.[141]   The five army personnel were charged by CBI with various offences, including criminal conspiracy, murder and kidnapping.[142]

101.   Despite this, the Indian Army blocked the prosecution of five army personnel under section 7 of the AFSPA. The Supreme Court of India upheld the army's action, ruling that criminal prosecution could not proceed without the central government's permission.[143] It added that the army has to decide within eight weeks whether it will hand over the accused to civilian courts or try them by court-martial.[144] It further said, "In case the option is made to try the case by a court-martial, the said proceedings would commence immediately and would be concluded expeditiously, strictly in accordance with law."

102.   Finally, in September 2012, over 12 years after the murder of the five civilians in Pathribal, the Indian Army chose to bring the case before the military justice system and began proceedings in a general court-martial.[145] However, on 24 January 2014 the Indian Army said it was dismissing all charges against five of its personnel due to a lack of evidence.[146] According to the closure report filed in the Srinagar Chief Magistrate's Court, the Indian Army did not conduct a trial but instead dismissed the charges through a pre-trial procedure known as summary of evidence under Rule 24 of the Army Rules 1954.[147]

103.   In 2017, the family members of the five civilians petitioned the Supreme Court to consider the matter once again, arguing that the army never conducted a trial.[148] The Supreme Court issued notice to the Central Government, Indian Army and CBI, but multiple hearings

2006, pp 52-53. Available from
https://www.hrw.org/reports/2006/india0906/india0906webwcover.pdf.

[138]   HRW, "'Everyone Lives in Fear' Patterns of Impunity in Jammu and Kashmir", p. 53.

[139]   Ibid.

[140]   "Pathribal fake encounter: CBI filed chargesheets", *Press Trust of India*, 11 May 20016. Available from
https://www.hindustantimes.com/india/pathribal-fake-encounter-cbi-files-chargesheets/story-OESVUJtcWUA5mpif3GAZ7J.html.

[141]   Amnesty International, "Denied..", p. 37, and HRW, "Everyone Lives in Fear", p. 57.

[142]   Ibid.

[143]   General Officer Commanding vs. Central Bureau of Investigation ([2012] 5 S.C.R. 599), 1 May 2012, p. 616, para 6(iii). Available from,
https://www.supremecourtofindia.nic.in/pdf/SupremeCourtReport/2012_v5_piii.pdf.

[144]   Ibid, p. 617, para 7(i).

[145]   "Court martial begins in Pathribal encounter case", *Press Trust of India*, 22 September 2012. Available from https://www.thehindu.com/todays-paper/tp-national/court-martial-begins-in-pathribal-encounter-case/article3924714.ece.

[146]   HRW, "India: Military court fails victims in Kashmir killings", 24 January 2014. Available from https://www.hrw.org/news/2014/01/24/india-military-court-fails-victims-kashmir-killings.

[147]   Amnesty International, "Denied..", p. 38.

[148]   "Pathribal encounter: SC agrees to examine pleas of victims' kin", *Press Trust of India*, 18 August 2017. Available from,
https://indianexpress.com/article/india/pathribal-encounter-sc-agrees-to-examine-plea-of-victims-kin-4803099/.

including in 2018 have been postponed due to inaction on the part of the authorities and the case remains stalled.[149]

104.    The Indian Army has also been resisting efforts to release details of trials conducted by military courts[150] where soldiers were initially found guilty but later acquitted and released by a higher military tribunal.[151] In 2017, the Indian Army petitioned the Delhi High Court urging it to set aside a 2015 Central Information Commission's order to release trial details to an individual who filed a right to information request.[152] The case has since been adjourned several times in 2018 and has been now listed for July 2019.[153]

105.    There has been no progress in the Kunan Poshpora mass rape case from 1991,[154] and authorities continue to thwart attempts of the survivors to get justice. The state government petitioned the Supreme Court against the Jammu and Kashmir High Court's 2014 order that directed the state government to pay compensation to the victims within three months.[155] The High Court order was based on the Jammu and Kashmir State Human Rights Commission's recommendations in 2011 to reopen and reinvestigate the case and to prosecute a senior official, whom it accused of deliberately obstructing the investigation.[156] The case remained stalled in the Supreme Court throughout 2018.

106.    Neither the state government nor central authorities have challenged the Armed Forces Tribunal's July 2017 decision to suspend the life sentences and to grant bail to five Indian Army personnel convicted by an army court-martial on 12 November 2014 for the extrajudicial killing of three civilians in Macchil in Baramulla district in 2010.[157]

107.    There has been no progress in investigations into the attacks and killings of minority Hindu community known as Kashmiri Pandits, thousands of whom were forced to flee the Kashmir Valley in the 1990s due to threats by armed groups.[158] In 2017, the Supreme Court rejected a petition seeking investigations into the killing of Kashmiri Pandits.[159] Neither the Central Government nor the state government has taken any steps for further investigation.

[149]  H137.
[150]  A RTI application filed in 2015 had sought details of the military court trial that found six Indian Army soldiers guilty of extrajudicial killing of three men in Macchil in Baramulla district in 2010. OHCHR has received a copy of this application and directions by India's Central Information Commission directing Indian Army to release details.
[151]  In July 2017, the Armed Forces Tribunal suspended the life sentences and granted bail to five Indian Army personnel who had been convicted by an army court-martial on 12 November 2014 for the extrajudicial killing of three civilians in Macchil in Baramulla district in 2010. The killings, which were perpetrated on the night of 29 April 2010, had triggered violent protests in Kashmir in the summer of 2010 and resulted in the deaths of over 100 protesters. The Armed Forces Tribunal's decision to suspend the life sentences has not been made public. Neither the state nor central authorities have challenged the Armed Forces Tribunal's order. (See OHCHR, "Report on the Situation of Human Rights in Kashmir", para 55.)
[152]  Delhi High Court, W.P (C) 5703/2017, "Union of India versus Venkatesh Nayak".
[153]  Ibid, adjournment order on 25 September 2018.
[154]  According to survivors and a local administration official, on the night of 23 February 1991, soldiers from the 4 Rajputana Rifles regiment of the Indian Army gang-raped around 23 women of Kunan and Poshpora villages of Kupwara district, Jammu and Kashmir. Details of this case were covered in OHCHR's June 2018 report. (See OHCHR, "Report on the Situation of Human Rights in Kashmir", paras 126-131)
[155]  "Kunan-Poshpora rapes: HC asks J&K to consider paying compensation in 3 weeks", *Indian Express*, 2 July 2014. Available from http://indianexpress.com/article/india/india-others/kunanposhpora-rapes-hc-asks-jk-to-consider-paying-compensation-in-3-weeks/.
[156]  Amnesty International, "India: Police must effectively investigate long-standing rape allegations against army in Jammu and Kashmir", 23 July 2013. Available from https://www.amnesty.org/download/Documents/12000/asa200352013en.pdf.
[157]  India, Armed Forces Tribunal, Ex Col. Dinesh Pathania, Ex Capt Upendra, Ex Hav Devender Kumar Vs Union of India & others, 25 July 2017. Available from http://www.livelaw.in/machil-fakeencounter-aft-gives-bail-5-ex-army-men-life-termsays-victims-dressed-like-terrorist-pathan-suit-readorder/.
[158]  OHCHR, "Report on the Situation of Human Rights in Kashmir", paras 137-139.
[159]  Ibid, para 139.

**F.   Restrictions on freedom of expression, censorship and attack on press freedoms**

108.   Jammu and Kashmir continues to face frequent barriers to internet access as the authorities continue to suspend arbitrarily internet services. According to a United Nations Educational, Scientific and Cultural Organization (UNESCO), South Asia reported the highest number of shutdowns in the world between April 2017 and May 2018 with India accounting for the highest level of shutdowns in the world.[160] Half of all internet shutdowns in India were reported from the Kashmir Valley.[161] UNESCO said that internet shutdowns "pose a threat to human rights and block the public's right to know; and have emerged a significant tool of censorship by governments which are increasingly utilizing shutdowns under the guise of security".[162] A widely followed Indian civil society group that tracks internet shutdowns reports that 65 of the 134 incidents of internet shutdowns recorded in the country in 2018 were in Jammu and Kashmir.[163] In the first 4 months of 2019, Jammu and Kashmir experienced 25 instances of internet shutdown.[164]

109.   In 2018, several journalists and human rights defenders – mostly based in the Kashmir Valley – reported that social media platforms Twitter and Facebook had taken actions against a number of accounts for various Kashmir-related content, including removing such posts or suspending user accounts.[165]

110.   As a State party to the International Covenant on Civil and Political Rights, India is obliged to protect the right to freedom of expression and opinion.[166] While Article 19(3) of the Covenant allows states to impose restrictions on certain grounds including protection of "public order",[167] the Human Rights Committee has warned that any such curbs must be necessary and proportionate and should not jeopardize the right itself.[168] Similarly, the Committee also noted that restrictions on the freedom of journalists or those wishing to travel to human rights-related meetings and restricting the entry of foreign journalists are not compatible with Article 19(3).[169]

111.   According to UNESCO, the Kashmir Valley continues to be an extremely dangerous place for journalists as 21 journalists have lost their lives in Kashmir Valley since 1990 in "targeted killings or caught in the cross-fire".[170] UNESCO notes, "[A]ssaults from all sides of the conflict – militants, the military and state-sponsored renegades ('surrendered militants' or *Ikhwanis*) had made journalism a hazardous profession during the 1990s. Abduction, parcel bombs and intimidation were not uncommon."[171]

112.   Press freedom groups reported several incidents of attacks and restrictions on journalists in the Kashmir Valley in 2018. On 2 June 2018, journalist Muheet ul Aslam allegedly was assaulted by Central Reserve Police Force personnel in Srinagar while on his way to cover the funeral of civilian who was killed after allegedly being run over by a Central Reserve Police Force truck.[172] Prominent Kashmiri journalist Shujaat Bukhari was

---

[160] UNESCO, "Clampdowns and Courage: South Asia Press Freedom Report 2017-2018", 11 May 2018, p. 32.

[161] Ibid.

[162] Ibid.

[163] Software Freedom Law Center, "Internet Shutdowns". Available from https://internetshutdowns.in/.

[164] Ibid.

[165] OL OTH 70/2018, Special Rapporteur on freedom of opinion and expression and Special Rapporteur on the situation of human rights defenders, 10 December 2018. Available from https://www.ohchr.org/Documents/Issues/Opinion/Legislation/OL_OTH_70_2018.pdf.

[166] Article 19, International Covenant on Civil and Political Rights (ICCPR).

[167] Article 19(3), ICCPR.

[168] Human Rights Committee, General Comment 34, Article 19, Freedoms of opinion and expression, CCPR/C/GC/34, 12 September 2011, paras 21-36.

[169] Ibid, para 45.

[170] UNESCO, "Clampdowns and Courage", p. 58.

[171] Ibid.

[172] Committee to Protect Journalists (CPJ), "Reporters assaulted by paramilitary officers in India", 5 June 2018. Available from https://cpj.org/2018/06/reporters-assaulted-by-paramilitary-officers-in-in.php.

assassinated by unknown gunmen outside his newspaper office in Srinagar on 14 June 2018.[173] Shujaat Bukhari, editor in chief of the Rising Kashmir media group, had been part of several 'track II' diplomacy initiatives between India and Pakistan that aimed at reducing tensions between the two countries and facilitating dialogue.[174] Jammu and Kashmir Police claimed that Pakistan-based Lashkar-e-Tayyiba armed group planned his assassination.[175] On 28 November 2018, authorities claimed to have killed the top Lashkar-e- Tayyiba operative responsible for Shujaat Bukhari's killing in an armed encounter in Budgam district.[176]

113.    On 27 August 2018, the authorities detained Aasif Sultan, Assistant Editor of Kashmir Narrator newspaper. On 1 September 2018, he was formally arrested for alleged involvement in a gunfight between security forces and armed groups in the Batamaloo area of Srinagar on 12 August 2018.[177] The Jammu and Kashmir Police told a local court that through his writings Aasif Sultan would "often give coverage to Hizbul Mujahideen terrorists, especially Burhan Wani, to attract youth towards terrorist organisations, especially Hizbul Mujahideen."[178] Aasif Sultan was charged under the Unlawful Activities (Prevention) Act 1967 with conspiracy, harbouring a "terrorist" and "support given to a terrorist organisation".[179] The Unlawful Activities (Prevention) Act, India's principal counter-terrorism law, permits pre-charge detention for up to 180 days, including 30 days in police custody, places limitation on bail, and presumes guilt in certain circumstances. The Unlawful Activities (Prevention) Act has been criticized by human rights defenders for falling short of India's obligations under international human rights law.[180] On 14 November 2018, a court denied his bail request and extended his detention until 7 December 2018, despite the fact that the police have failed to file formal charges against him.[181] As of 1 May 2019, Aasif Sultan remains in detention. The Twitter account of Kashmir Narrator newspaper was blocked at the time of Aasif Sultan's arrest; the official reason given by Twitter was: "Account withheld – @KashmirNarrator's account has been withheld in India in response to a legal demand."[182]

114.    During the local body elections organized in October 2018, media associations reported several cases of police assaults and severe restrictions against journalists from across

---

[173] Reporters Without Borders, "India: Well-known newspaper editor gunned down in Kashmir", 14 June 2018. Available from https://rsf.org/en/news/india-well-known-newspaper-editor-gunned-down-kashmir.

[174] Opening statement and global update of human rights concerns by UN High Commissioner for Human Rights Zeid Ra'ad Al Hussein at 38th session of the Human Rights Council. Available from https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=23206&LangID=E.

[175] "Conspiracy to kill journalist Shujaat Bukhari hatched in Pak: Police", Press Trust of India, 28 June 2018. Available from https://www.indiatoday.in/pti-feed/story/conspiracy-to-kill-journalist-shujaat-bukhari-hatched-in-pak-police-1272597-2018-06-28.

[176] "LeT militant involved in Shujaat Bukhari's assassination killed in J-K: officials", Press Trust of India, 28 November 2018. Available from https://economictimes.indiatimes.com/news/defence/let-militant-involved-in-shujaat-bukharis-assassination-killed-in-j-k-officials/articleshow/66840524.cms.

[177] Amnesty International, "J&K: Deteriorating space for freedom of press", 11 September 2018. Available from https://amnesty.org.in/news-update/jk-deteriorating-space-for-freedom-of-press/.

[178] Ibid.

[179] Ibid.

[180] The Special Rapporteur on the situation of human rights defenders has previously called for the repeal of the Unlawful Activities (Prevention) Act. (Report of the Special Rapporteur on the situation of human rights defenders, Margaret Sekaggya, A/HRC/19/55/Add.1, 6 February 2012, para 145). On 28 September 2018, seven Special Procedures mandates, including the Working Group on Arbitrary Detention and the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism, sent a communication to the Government expressing concern about "an alarming pattern with regard to the use by the authorities of provisions of the Penal Code and of the Unlawful Activities Prevention Act to suppress dissent and to curtail human rights work, in particular with regard to the defence and promotion of the rights and freedoms of minorities and scheduled castes." IND 21/2018.

[181] CPJ statement available from https://twitter.com/CPJAsia/status/1062759732077723648.

[182] Amnesty International, "J&K: Deteriorating space for freedom of press".

the Kashmir Valley.[183] These incidents included police preventing journalists from covering the local body elections by placing restrictions on their movement or preventing them from taking photographs, police stopping journalists from covering public funerals of armed groups members killed in gunfights with security forces, journalists beaten up by security forces while covering security operations, journalists getting hit by metal pellets and journalists assaulted for allegedly informing stone throwing protesters of police movement.[184]

115.    Journalists in Kashmir also face threats from and intimidation by armed groups. In May 2018, photojournalist Masrat Zahra faced online harassment and threats when a photograph of her was circulated on social media platforms with the caption 'mukhbir', which means "spy" or "informer".[185]

116.    Days ahead of his assassination, journalist Shujaat Bukhari had been targeted by an anonymous blog that accused him of "furthering Indian interests" through his work for peace process initiatives.[186] The same blog also made veiled threats against two other Kashmiri journalists weeks after his murder.[187]

117.    Foreign journalists based in India informed OHCHR that beginning in mid-2018 the Indian authorities introduced new restrictions on foreign media personnel reporting from Jammu and Kashmir including the need for special permission from the central government.[188] According to the former South Asia Bureau Chief of *The Washington Post*, in May 2018 the Government of India sent official warnings to foreign journalists about travelling to "certain areas" without permission. This was interpreted to mean permission for going to Kashmir.[189] OHCHR verified this new policy with multiple foreign correspondents, many of whom have been waiting for official permission to visit Jammu and Kashmir for several weeks.[190] Indian authorities have informed journalists that this is neither the revival of an old policy nor a new policy but merely an enforcement of an existing rule. Journalists said that the Government of India had sent a reminder of this rule in 2016 but authorities did not insist on compliance with this policy until May 2018.[191]

118.    In December 2018, Reuters photojournalist Cathal McNaughton was denied re-entry into India for allegedly travelling to "restricted parts" of Jammu and Kashmir without "valid permission".[192]

119.    Independent experts of the United Nations and regional organizations on freedom of expression have made a Joint Declaration on Freedom of Expression and Responses to Conflict Situations, stating that "administrative measures should not be used to restrict the movement of journalists, including the entry of foreign journalists into a country, or media coverage of demonstrations or other events of public interest, unless this is strictly justified by the exigencies of the situation, in line with the three-part test."[193]

---

[183]  CPJ, "Kashmiri journalists face multiple restrictions, attacks in October", 14 November 2018. Available from https://cpj.org/2018/11/kashmiri-journalists-face-multiple-restrictions-at.php.

[184]  Ibid.

[185]  CPJ, "In India, Kashmiri photojournalist faces harassment, threats", 22 May 2018. Available from https://cpj.org/2018/05/in-india-kashmiri-photojournalist-faces-harassment.php.

[186]  OHCHR has verified the threats made on this blog.

[187]  Ibid.

[188]  J41; J59.

[189]  "Dangerous times for the press in Kashmir", Annie Gowen, 3 October 2018. Available from https://www.cjr.org/watchdog/journalism-kashmir.php.

[190]  J41; J59.

[191]  Ibid.

[192]  "Pulitzer winner Cathal McNaughton denied back entry into India for allegedly travelling to J-K restricted areas", *Press Trust of India*, 28 December 2018. Available from https://www.hindustantimes.com/india-news/pulitzer-winner-cathal-mcnaughton-denied-back-entry-into-india-for-allegedly-travelling-to-j-k-restricted-areas/story-Na9X38Hvu0QIIkOyObSKdK.html.

[193]  The three part test is: "it is provided for by law, it serves to protect a legitimate interest recognised under international law and it is necessary to protect that interest." (See "Joint Declaration on Freedom of Expression and responses to conflict situations". Available from

## G.   Restrictions on freedom of assembly and association

120.   On 28 February 2019, the central government declared religious-political organization Jamaat-e-Islami (Jammu and Kashmir) an unlawful association under section 3(1) of the Unlawful Activities (Prevention) Act 1967.[194] The government banned the Jamaat-e-Islami, which runs schools and mosques in the state, for five years for trying to "escalate secessionist movement"[195] and forming the Hizbul Mujahideen armed group and providing it material support.[196] Days before the ban, authorities in Jammu and Kashmir arrested over 150 leaders and members of the Jamaat-e-Islami.[197] It was previously banned in 1990.[198]

121.   On 22 March 2019, the central government declared the pro-independence Jammu and Kashmir Liberation Front (Yasin faction) an unlawful association under the Unlawful Activities (Prevention) Act.[199] This political party is led by Mohammed Yasin Malik who gave up armed insurgency in 1995 for non-violent political activism. He was detained on 22 February 2019 under the PSA and later arrested on 9 April 2019 by the National Investigation Agency (NIA)[200] in a case related to funding of separatist political parties in Jammu and Kashmir.[201] Mohammed Yasin Malik is also accused of a kidnapping in 1989 and murder of four Indian Air Force personnel in 1990.[202]

122.   Political leaders in Jammu and Kashmir criticized the ban on Jamaat-e-Islami and the Jammu and Kashmir Liberation Front as an attack on civil liberties and one that would have a "major social impact" in the state.[203]

123.   Authorities in Jammu and Kashmir employ various means to disrupt the right to freedom of peaceful assembly and association of separatist or pro-independence leaders. They are often placed under house arrest for several days in order to prevent them from participating or leading protests, public meetings and even religious congregations.[204] Authorities use sections 144, 107 and 151 of the Jammu and Kashmir Code of Criminal Procedure 1989[205] to thwart the political work of separatist or pro-independence leaders.[206]

---

http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=15921&LangID=E#sthash.qEj2NPoj.dpuf.)

[194] India, Press Information Bureau, "Strong Action against Terrorism in Jammu & Kashmir", 22 March 2019. Available from http://pib.nic.in/PressReleaseIframePage.aspx?PRID=1569293.

[195] "Govt bans Jamat-e-Islami J&K for 5 years", All India Radio, 1 March 2019. Available from http://newsonair.nic.in/Main-News-Details.aspx?id=360388.

[196] Press Information Bureau, "Strong Action against Terrorism in Jammu & Kashmir".

[197] "Crackdown on Jamaat-E-Islami Cadre in Kashmir, Top Leaders Detained", Press Trust of India, 23 February 2019. Available from https://thewire.in/government/crackdown-on-jamaat-e-islami-cadre-in-kashmir-top-leaders-detained.

[198] "Govt imposes ban on Jamaat-e-Islami Jammu and Kashmir", Press Trust of India, 28 February 2019. Available from http://www.ptinews.com/news/10417396_Govt-imposes-ban-on-Jamaat-e-Islami-Jammu-and-Kashmir.html.

[199] Press Information Bureau, "Strong Action against Terrorism in Jammu & Kashmir".

[200] NIA is India's central counter-terrorism law enforcement agency.

[201] "Yasin Malik produced before Delhi court in terror funding case", Press Trust of India, 10 April 2019. Available from https://www.business-standard.com/article/pti-stories/yasin-malik-produced-before-delhi-court-in-terror-funding-case-119041000343_1.html.

[202] Ibid.

[203] "JKLF Ban Will Turn Kashmir Into Open Prison", Press Trust of India, 23 March 2019. Available from http://www.newindianexpress.com/nation/2019/mar/23/ban-on-jklf-will-turn-kashmir-into-open-air-prison-pdp-chief-mehbooba-mufti-1954528.html; "Omar Abdullah asks govt to review ban on Jamaat-e-Islami, says it's having major social impact on J&K", Press Trust of India, 3 March 2019. Available from https://www.indiatoday.in/india/story/omar-abdullah-jamaat-e-islami-ban-jammu-kashmir-1469567-2019-03-03.

[204] L177; L181.

[205] Due to its special status under the Constitution of India, Jammu and Kashmir has its own Code of Criminal Procedure that is largely similar to the India code. Jammu and Kashmir has also its own penal code – Ranbir Penal Code – which is similar to the Indian Penal Code.

[206] L177; L181.

## H.   Torture

124.   As a State Party to the International Covenant on Civil and Political Rights, which prohibits torture under any circumstances,[207] India is obliged to ensure that no person is "subjected to torture or to cruel, inhuman or degrading treatment or punishment". As described in the June 2018 report of OHCHR, there have been persistent claims of torture by security forces in Indian-Administered Kashmir, especially during the 1990s and early 2000s.[208]

125.   Rizwan Pandit, a school principal from Pulwama district aged 29 who died while in police custody between 18 and 19 March 2019,[209] appears to have been tortured while in custody. He was picked up from his home in Awantipora allegedly by the National Investigation Agency on 18 March and was pronounced dead by Jammu and Kashmir Police on 19 March. A magisterial inquiry has been ordered into his death.[210] Rizwan Pandit's family told journalists that there were torture marks on his body and they have called for his exhumation for further investigations to be carried out.[211] The Jammu and Kashmir National Conference party called on the current Jammu and Kashmir administration to clarify whether Rizwan Pandit was in the custody of the state police or the NIA at the time of his death.[212]

126.   No security forces personnel accused of torture or other forms of degrading and inhuman treatment have been prosecuted in a civilian court since these allegations started emerging in the early 1990s. This includes the two cases of torture highlighted in OHCHR's June 2018 report – the death of college lecturer Shabir Ahmad Mango due to alleged torture while he was in the custody of the Indian Army in August 2016,[213] and the case of Farooq Ahmad Dar who was strapped to the front of a moving Indian Army vehicle for several hours in April 2017.[214] The Indian Army officer implicated in the Farooq Ahmad Dar case was presented an award in May 2017.[215] The same officer was reportedly indicted by an Army

[207]   Article 7, International Covenant on Civil and Political Rights. The prohibition of torture is also a norm of customary law. See, for instance, International Criminal Tribunal for the Former-Yugoslavia, Prosecutor v. Zejnil Delalić, Zdravko Mucić also known as "PAVO", Hazim Delić, Esad Landžo also known as "ZENGA", Trial Chamber, judgment, 16 November 2018, paras 452-454.

[208]   HRW, "Everyone Lives in Fear - Patterns of impunity in Jammu and Kashmir", 11 September 2006, pp. 94-102. Available from https://www.hrw.org/sites/default/files/reports/india0906web.pdf. Amnesty International, "India: Torture continues in Jammu and Kashmir", 1 November 1995. Available from https://www.amnesty.org/en/documents/asa20/033/1995/en/; Amnesty International, "Torture and deaths in custody in Jammu and Kashmir", 31 January 1995. Available from https://www.amnesty.org/en/documents/ASA20/001/1995/en/; Amnesty International, "India: Torture continues in Jammu and Kashmir", November 1995. Available from http://www.amnesty.org/en/library/info/ASA20/033/1995/en; JKCCS, "Torture: Indian state's instrument of control in Indian-administered Jammu and Kashmir", February 2019.

[209]   "School teacher, arrested in terror case, dies in custody in J&K", Press Trust of India, 19 March 2019. Available from https://timesofindia.indiatimes.com/india/school-teacher-arrested-in-terror-case-dies-in-custody-in-jk/articleshow/68481151.cms.

[210]   "School teacher, arrested in terror case, dies in custody in J&K", Press Trust of India, 19 March 2019.

[211]   "NC takes out march to protest custodial death of teacher", Press Trust of India, 21 March 2019. Available from http://www.ptinews.com/news/10458795_NC-takes-out-march-to-protest-custodial-death-of-teacher.html.

[212]   "In whose custody was Awantipora youth, clarify: NC to J-K admin", Press Trust of India, 20 March 2019. Available from https://www.business-standard.com/article/pti-stories/in-whose-custody-was-awantipora-youth-clarify-nc-to-j-k-admin-119032000462_1.html.

[213]   "Army regrets lecturer killing; orders probe", Press Trust of India, 18 August 2016. Available from https://www.indiatoday.in/pti-feed/story/army-regrets-lecturer-killing-orders-probe-686753-2016-08-18.

[214]   "Kashmiri man used as human shield by army narrates his ordeal", Video Volunteers, 18 April 2017. Available from https://www.youtube.com/watch?v=f5ThpNSI460.

[215]   Chief of Army Staff General Bipin Rawat told the Press Trust of India that the "main objective of awarding Major Leetul Gogoi, when a Court of Inquiry was finalizing its probe into the incident, was to boost the morale of young officers of the force who are operating in a very difficult environment in the militancy- infested state.". ("Dirty war has to be fought with innovative ways: Gen Rawat", Press

Court of Inquiry in September 2018 for allegedly "fraternising" with a local woman in Srinagar.[216]

## I.   Targeting of Kashmiri Muslims[217] outside Jammu and Kashmir

127.   The 14 February 2019 suicide car bomb attack on Indian security forces in Pulwama triggered major protests across India. Following the attack several reports emerged of mobs targeting Kashmiri Muslims living and working in different parts of India.[218] There were several reports of Kashmiri students and traders being beaten, threatened, and intimidated in different states of India.[219] Amnesty International said ordinary Kashmiris were being targeted due to their identity.[220]

128.   On social media, individuals, journalists and even some political leaders were inciting hatred and violence against Kashmiri Muslims, people critical of the ruling Bharatiya Janata Party's (BJP) Kashmir policies or those seeking accountability for human rights abuses in Jammu and Kashmir.[221] In one instance, the Central Government-appointed Governor of Tripura state made a social media statement suggesting Indians consider a "boycott of all things Kashmiri".[222] No action has been taken against him or any others who incited hatred and violence against Kashmiris.

129.   On 22 February 2019, the Supreme Court of India directed the Central Government and three state governments to "take prompt and necessary action to prevent incidents of assault, threat, social boycott and such other egregious acts against the Kashmiris".[223] India's National Human Rights Commission issued notices to the Central Government and three state governments seeking reports on the "ill-treatment of Kashmiris".[224] While a federal minister denied there were any cases of harassment of Kashmiri students,[225] the Indian Prime Minister Narendra Modi criticized the harassment of Kashmiris after the Pulwama attack.[226]

---

*Trust of India*, 28 May 2017. Available from http://www.ptinews.com/news/8744667_PTI-Exclusive--Dirty-war-has-to-be-fought-with-innovative-ways--Gen-Bipin-Rawat.html.)

[216]   "Major Leetul Gogoi shifted out of unit", *Press Trust of India*, 19 September 2018. Available from https://www.thehindu.com/news/national/major-leetul-gogoi-shifted-out-of-unit/article24980563.ece.

[217]   Here Kashmiri Muslims denotes all Muslim residents of the Indian state of Jammu and Kashmir and not just the Kashmiri-speaking Muslims of the state.

[218]   Amnesty International, "India: Authorities must uphold Constitutional values in wake of Pulwama attack", 18 February 2019. Available from https://amnesty.org.in/news-update/india-authorities-must-uphold-constitutional-values-in-wake-of-pulwama-attack/; HRW, "India's violent mobs are a menace to minorities – and democracy", 18 March 2019. Available from https://www.hrw.org/news/2019/03/18/indias-violent-mobs-are-menace-minorities-and-democracy.

[219]   Ibid

[220]   Amnesty International, "India: Authorities must uphold Constitutional values in wake of Pulwama attack".

[221]   Verified by OHCHR through analysis of multiple social media accounts.

[222]   Tweet by Governor of Tripura state, 19 February 2019. Available from https://twitter.com/tathagata2/status/1097779171110068224.

[223]   Supreme Court of India, Tariq Adeeb v Union of India, Writ Petition (criminal) No. /2019, 22 February 2019.

[224]   "NHRC issues notices to Centre Bengal, UP, U'khand over 'ill-treatment' of Kashmiris", *Press Trust of India*, 21 February 2019. Available from https://www.indiatoday.in/india/story/nhrc-issues-notices-to-centre-bengal-up-u-khand-over-ill-treatment-of-kashmiris-1462003-2019-02-21.

[225]   "Pulwama Aftermath: Prakash Javadekar Denies Reports Of Assault Of Kashmiri Students", *Press Trust of India*, 20 February 2019. Available from https://www.huffingtonpost.in/entry/pulwama-aftermath-prakash-javadekar-denies-reports-of-assault-of-kashmiri-students_in_5c6d35a6e4b0e2f4d8a109a1.

[226]   "PM Modi condemns 'harassment' of Kashmiris, says we have to take them with us", *Press Trust of India*, 20 February 2019. Available from https://www.hindustantimes.com/india-news/pm-modi-condemns-harassment-of-kashmiris-says-we-have-to-take-them-with-us/story-YCSy3fGhP36MUerVBGq0yN.html.

130.    According to JKCCS, there have been increasing cases of harassment and persecution of Kashmiris living and working in different parts of India over the last few years.[227] The group compiled at least 22 such cases in 2018 in which 24 Kashmiri students were assaulted.[228] JKCCS notes that "the rise in right-wing mob violence in India" has made Kashmiris living in different parts of India insecure and fearful of being harassed and physically attacked.[229]

# VI.    Abuses by armed groups[230]

131.    The Government of India accuses armed groups supported by Pakistan of committing human rights abuses including targeting civilians and off-duty soldiers in the Indian state of Jammu and Kashmir.[231] According to Indian authorities, "cross-border terrorism emanating from Pakistan" is the main challenge in Jammu and Kashmir.[232] The Government of Pakistan disputes this position as "self-serving and motivated by a deliberate design to project the legitimate indigenous Kashmiri struggle for self-determination" terrorism.[233]

132.    Since the late 1980s, a variety of armed groups has been actively operating in the Indian state of Jammu and Kashmir, and there has been documented evidence of these groups committing a wide range of human rights abuses, including kidnappings, killings of civilians and sexual violence.[234] While in the 1990s there were reportedly over a dozen armed groups operating in Indian-Administered Kashmir, in recent years four major armed groups are believed to be operational in this region: Lashkar-e-Tayyiba, Jaish-e-Mohammed, Hizbul

---

[227]  On 2 February 2018, Kashmiri students studying at the Haryana Central University were physically assaulted while returning to campus after offering congregational Friday prayers in Mahendragarh town, Haryana; In August 2018, four Kashmiri students in a Benguluru college were reportedly barred from attending their classes for growing beards. The Principal of the college cited 'hygiene' as a reason to bar the students from taking their classes; On 12 October 2018, the Aligarh Muslim University suspended three Kashmiri students for offering funeral prayers in absentia for a former student Manan Wani who joined the Hizb-ul-Mujahideen armed group and was killed in a gunfight with the security forces in Kupwara district on 1 April 2018. (See JKCCS, "Annual Human Rights Review 2018", p.6.)

[228]  Ibid, pp 54-57.

[229]  Ibid, p.6.

[230]  In the humanitarian field, the United Nations has developed the following working definition of non-State armed groups (hereinafter: armed groups): "Groups that have the potential to employ arms in the use of force to achieve political, ideological or economic objectives; are not within the formal military structures of States, State-alliances or intergovernmental organizations; and are not under the control of the State(s) in which they operate." (G. McHugh, M. Bessler, *Humanitarian negotiations with armed groups: A manual for practitioners*, United Nations: New York, 2006, p. 87. Available from https://reliefweb.int/sites/reliefweb.int/files/resources/28BEC3628B99A532852571070071B4B3-unocha-30jan.pdf.)

[231]  Human Rights Council, Right of Reply by India in response to the Statement made by Pakistan and Pakistan on behalf of OIC under the Agenda Item 2, 19 June 2018. Available from https://www.pmindiaun.gov.in/pages.php?id=1773.

[232]  Human Rights Council, Right of Reply by India in response to the Statement made by Pakistan and Pakistan on behalf of OIC under the Agenda Item 2, 11 September 2018. Available from https://www.pmindiaun.gov.in/pages.php?id=1806.

[233]  Human Rights Council, Right of Reply by Pakistan to the Statement made by India, under Agenda Item 3, 9 March 2019.  Available from http://pakistanmission-un.org/?p=2833.

[234]  OHCHR, "Report on the situation of human rights in Kashmir", paras 135-137; Carnegie Endowment for International Peace, "The menace that is Lashkar-e-Taiba", March 2012. Available from https://carnegieendowment.org/files/LeT_menace.pdf. HRW, "Behind the Kashmir Conflict: Abuses by the Indian Security Forces and Militant Groups Continue", 1999. Available from https://www.hrw.org/reports/1999/kashmir/back.htm. Amnesty International, "Appeal to armed opposition groups in Jammu and Kashmir to abide by humanitarian law", 3 March 1997, pp. 1-2. Available from https://www.amnesty.org/download/Documents/160000/asa200381997en.pdf. Amnesty International, "India: Impunity in Jammu and Kashmir", April 2001, p. 2. Available from https://www.amnesty.org/download/Documents/128000/asa200232001en.pdf.

Mujahideen and Harakat Ul-Mujahidin.[235] All four are believed to be based in Pakistan-Administered Kashmir,[236] although two of the four are banned by the Government of Pakistan.[237]

133.   According to JKCCS, 18 civilians were killed by armed group members and another 25 civilians by unknown gunmen in 2018.[238] On 22 March 2019, a 12-year-old boy was reportedly killed when he was held hostage by three members of Lashkar-e-Tayyiba who were trapped in an armed encounter with Indian security forces in Shopian district.[239]

134.   On 18 March 2019, the Special Rapporteur on extrajudicial, summary or arbitrary executions wrote to the Indian authorities seeking information on the killing of five civilians by alleged "militants or unknown individuals".[240] The Special Rapporteur has previously highlighted that "absolute prohibition against extrajudicial executions applied to armed non-state actors that control territories and populations".[241]

135.   Two armed groups have been accused of recruiting and deploying child soldiers in Indian-Administered Kashmir. According to the Special Representative of the United Nations Secretary-General on Children and Armed Conflict, in 2018 three cases of "recruitment and use of children" was reported from the Indian state of Jammu and Kashmir. One case was attributed to Jaish-e-Mohammed and the other two to Hizbul Mujahideen.[242] On 9 December 2018, two child soldiers - aged 14 and 17 years - allegedly recruited by Lashkar-e-Tayyiba reportedly were killed in a gunfight with Indian security forces in the Hajin area of Bandipora district.[243] The two children had been reported missing on 31 August 2018, and Jammu and Kashmir Police believe they had joined Lashkar-e-Tayyiba in October 2018.[244]

136.   Hours after the release of OHCHR's June 2018 Kashmir report, content defaming JKCCS and prominent human rights defender Khurram Parvez was spread by a group that claimed to have ISIS affiliation.[245] The group made death threats to Khurram Parvez and his family, and denounced the work of JKCCS.[246]

---

[235] https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/lashkar-etayyiba; https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/jaish-imohammed; https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/harakat-ulmujahidin/hum; ICG, "Kashmir: Confrontation and Miscalculation", 11 July 2002, pp. 6-8. Available from https://www.crisisgroup.org/asia/south-asia/kashmir/kashmirconfrontation-and-miscalculation.

[236] Ibid.

[237] According to the list updated on 10 May 2019, https://nacta.gov.pk/wp-content/uploads/2017/08/Proscribed-OrganizationEng.pdf. However, founders and leaders of Lashkar-e-Tayyiba and Jaish-e-Mohammed who are both on the UNSC Al-Qaeda/ISIL sanctions list have not been arrested and prosecuted yet.

[238] JKCCS, "Annual Human Rights Review 2018", p.8.

[239] Three militants, minor held hostage by ultras killed in encounters in J-K", *Press Trust of India*, 22 March 2019. Available from https://www.business-standard.com/article/pti-stories/three-militants-minor-held-hostage-by-ultras-killed-in-encounters-in-j-k-119032200434_1.html.

[240] IND 8/2019, Mandates of the Special Rapporteur on extrajudicial, summary or arbitrary executions; the Special Rapporteur on the right of everyone to the enjoyment of the highest attainable standard of physical and mental health; the Special Rapporteur on torture and other cruel, inhuman or degrading treatment of punishment, 18 March 2019, p. 1.

[241] Ibid, p.4.

[242] A/72/865-S/2018/465, para 218.

[243] "They joined militancy together, died together", *Greater Kashmir*, 10 December 2018. Available from https://www.greaterkashmir.com/news/front-page/they-joined-militancy-together-died-together/305641.html.

[244] Ibid.

[245] A/HRC/39/41, Cooperation with the United Nations, its representatives and mechanisms in the field of human right, Report of the Secretary General, 13 August 2018, para 24. Available from http://ap.ohchr.org/documents/dpage_e.aspx?si=A/HRC/39/41.

[246] Ibid.

137.  Amidst rising tensions in August 2018, an armed group abducted 11 people closely related to Jammu and Kashmir Police personnel from various parts of the Kashmir Valley and released them unhurt a few days later.[247] The abductions were reportedly a retaliation for the harassment faced by the families of armed group members.[248]

138.  Armed groups were reportedly responsible for attacks on persons affiliated or associated with political organizations in Jammu and Kashmir including the killing of at least six political party workers and a separatist leader. In the lead up to the local body elections scheduled for October 2018, armed groups threatened Kashmiris against participating in the elections and warned of "dire consequences" if those running for elections did not immediately withdraw their nomination papers and publicly apologised for their actions.[249]

139.  While armed groups have sporadically threatened political workers in previous elections, the number of attacks in 2018 is amongst the highest in recent times. Jammu and Kashmir Police blamed unnamed armed groups for abducting and killing a political activist of the Bharatiya Janata Party in Pulwama district on 22 August 2018.[250] Authorities accused unnamed armed groups for the killing of two political activists from the Jammu and Kashmir National Conference in Srinagar on 5 October 2018.[251] A member of the Jammu and Kashmir People's Democratic Party was shot dead by suspected armed group members in Srinagar on 29 October 2018.[252] On 1 November 2018, the Jammu and Kashmir state secretary of the BJP and his brother were shot dead by suspected armed group members in the Kishtwar district of Jammu region.[253] Police blamed armed groups for killing BJP's youth wing activist in Shopian district on 3 November 2018.[254] A person associated with the separatist groups Tehreek-e-Hurriyat[255] was shot dead by unknown gunmen inside his house in Anantnag district on 20 November 2018.[256] A political worker with the Janata Dal (United) party narrowly escaped an attack by unidentified gunmen in Srinagar on 28 November 2018.[257]

140.  The 14 February 2019 suicide bombing on Indian security forces in Pulwama was claimed by Jaish-e-Mohammed.[258] While India blamed Pakistan for continuing to support the group's activities, Pakistan denied the allegations and asked India to provide "actionable evidence" about the involvement of any Pakistani national. Pakistan Foreign Minister Shah

---

[247]  "Militants release all abducted kin of Kashmir policemen," *Press Trust of India*, 31 August 2018. Available from https://www.tribuneindia.com/news/jammu-kashmir/militants-release-all-abducted-kin-of-kashmir-policemen/645634.html.

[248]  Ibid.

[249]  Videos of Lashkar-e-Tayyiba and Hizbul Mujahideen leaders issuing threats ahead of Jammu and Kashmir urban body elections. (Available from https://www.youtube.com/watch?v=dMMCR75l7Lo; https://www.youtube.com/watch?time_continue=8&v=mAfz7zbud9A, https://www.youtube.com/watch?v=AsU08-auV_1)

[250]  "Three policemen, BJP activist killed in Kashmir on Eid", *Press Trust of India*, 22 August 2018. Available from https://timesofindia.indiatimes.com/india/two-policemen-bjp-activist-killed-in-kashmir-on-eid/articleshow/65505151.cms.

[251]  "Gunmen shoot and kill 2 Kashmir activists of pro-India party", *Associated Press*, 5 October 2018. Available from https://www.apnews.com/1938f0478231445da02128bf496d5eae.

[252]  "Political parties condemn killing of SI and PDP worker in Kashmir", *Press Trust of India*, 29 October 2018. Available from https://indianexpress.com/article/india/political-parties-condemn-killing-of-pdp-worker-kashmir-5424187/.

[253]  "J&K BJP leader's killing: Situation in curfew-bound areas remain tense", *Press Trust of India*, 2 November 2018. Available from https://www.theweek.in/news/india/2018/11/02/JK-BJP-leader-killing-Situation-in-curfew-bound-areas-remain-tense.html.

[254]  "BJP youth wing leader killed by terrorists in Jammu and Kashmir", *Press Trust of India*, 3 November 2018. Available from https://www.ndtv.com/srinagar-news/bjp-youth-wing-leader-killed-by-terrorists-in-jammu-and-kashmir-1770534.

[255]  Tehreek-e-Hurriyat is a separatist political party led by Syed Ali Shah Geelani.

[256]  "Jammu and Kashmir: Hurriyat leader Hafizullah Mir shot dead in Anantnag", *Press Trust of India*, 20 November 2018. Available from https://scroll.in/latest/902798/jammu-and-kashmir-hurriyat-leader-hafizullah-mir-shot-dead-in-anantnag-say-reports.

[257]  "Unidentified gunmen open fire on vehicle carrying JD (U) leader", *Press Trust of India*, 28 November 2018. Available from http://www.newindianexpress.com/nation/2018/nov/28/unidentified-gunmen-open-fire-on-vehicle-carrying-jd-u-leader-1904445.html.

[258]  "Profile: What is Jaish-e-Muhammad?", Al Jazeera, 15 February 2019.

Mehmood Qureshi told an international news organization that Jaish-e-Mohammed founder Mohammad Masood Azhar is present in Pakistan and if India provides strong evidence then they will arrest him in accordance with applicable legal processes.[259] However, a spokesperson for the Pakistan Army denied that Jaish-e-Mohammed "exists formally" in Pakistan.[260]

141.    On 1 May 2019, the United Nations Security Council Da'esh and Al-Qaida Sanctions Committee announced that it had added Mohammad Masood Azhar to its list of individuals or entities subject to the assets freeze, travel ban and arms embargo.[261]

142.    On 21 February 2019, Pakistan announced that it was listing Jamaat ud Dawa and its charity wing Falah-i-Insaniyat Foundation as proscribed organizations under Pakistan's Anti-Terrorism Act.[262] On 5 March 2019, Pakistani authorities said Mufti Abdul Raoof and Hamad Azhar – brother and son of Jaish-e-Mohammed founder Masood Azhar – have been placed in "preventive detention" until India provides proof of their criminal activities.[263] The Interior Ministry representatives stated that if they find no proof they would release Mufti Abdul Raoof and Hamad Azhar from detention.[264] On 28 March 2019, Pakistan rejected the Indian dossier detailing proof of Jaish-e-Mohammed's complicity in the Pulwama attack.[265]

143.    Pakistan-based armed groups that operate mostly in Indian-Administered Kashmir have also been accused of harassing and threatening nationalist and pro-independence political workers in Pakistan-Administered Kashmir.[266]

144.    On 2 August 2018, unknown armed group members attacked and burned down at least 12 schools in Gilgit-Baltistan's Diamer district.[267] At least half were girls' schools.[268]

145.    On 22 February 2019, the Financial Action Task Force (FATF), an inter-governmental organization that monitors money laundering and terrorist financing, said Pakistan had made a "high-level political commitment" to work with FATF "to address its strategic counter-terrorist financing-related deficiencies".[269] However, FATF added that Pakistan "does not demonstrate a proper understanding of the TF [terror financing] risks posed by Da'esh, AQ [Al Qaeda], JuD [Jamaat ud Dawa], FiF [Falah-i-Insaniyat Foundation], LeT [Lashkar e Tayyiba], JeM [Jaish-e-Mohammed], HQN [Haqqani Network], and persons affiliated with the Taliban."[270] It urged Pakistan to address its "strategic deficiencies" and complete its action plan.[271]

[259] "Pakistan FM: Pakistan never wants to escalate", 28 February 2019. Available from https://edition.cnn.com/videos/tv/2019/02/28/amanpour-shah-mehmood-qureshi.cnn.

[260] "Instead of accusing, world should assist Pakistan in fight against terrorism", 6 March 2019. Available from https://www.dawn.com/news/1467981. (Video available from https://www.youtube.com/watch?v=fRZg1igCjcE)

[261] Security Council ISIL (Da'esh) Al-Qaida Sanctions Committee, 1 May 2019. Available from https://www.un.org/press/en/2019/sc13798.doc.htm.

[262] Pakistan, National Counter Terrorism Authority. Available from https://nacta.gov.pk/wp-content/uploads/2018/12/Proscribed-OrganizationEng.pdf.

[263] Pakistan Ministry of Interior press conference, 5 March 2019. Available from https://www.youtube.com/watch?v=By0OZGRJo7E.

[264] Ibid.

[265] Pakistan, Ministry of Foreign Affairs, Press Briefing, 28 March 2019. Available from http://www.mofa.gov.pk/pr-details.php.

[266] P117.

[267] HRW, "World Report 2019: Pakistan". Available from https://www.hrw.org/world-report/2019/country-chapters/pakistan.

[268] Ibid.

[269] Financial Action Task Force, "Improving Global AML/CFT Compliance: On-going Process", 22 February 2019. Available from http://www.fatf-gafi.org/countries/a-c/bahamas/documents/fatf-compliance-february-2019.html#Pakistan.

[270] Ibid.

[271] Ibid.

# VII. Human Rights Violations in Pakistan-Administered Kashmir

## A. Constitutional and legal structures impacting the enjoyment of human rights

146.   Pakistan-Administered Kashmir comprises two administrative regions: Azad Jammu and Kashmir (AJK) and Gilgit-Baltistan (G-B). In the June 2018 report, OHCHR noted that, the human rights violations in Pakistan-Administered Kashmir are of a different calibre or magnitude and of a more structural nature than those in Indian-Administered Kashmir. OHCHR made several recommendations to the Pakistani authorities to address these issues. In its response to OHCHR's observations in the June 2018 report, the Government of Pakistan maintained that the constitutional and legal structures of Azad Jammu and Kashmir and Gilgit-Baltistan adequately protect the rights of its citizens. However, OHCHR's monitoring and analysis found that these concerns remain. Both regions introduced constitutional changes, but failed to address the main elements that restrict the full enjoyment of all human rights for people living in these regions.

147.   The Azad Jammu and Kashmir Legislative Assembly passed the 13th amendment to its Interim Constitution on 2 June 2018 altering the Kashmir Council's role to an advisory one.[272] While Pakistani authorities said the amended Interim Constitution will "empower the AJK legislative assembly",[273] India protested the move.[274] Azad Jammu and Kashmir political leaders suggested that by changing the role of the Kashmir Council to an advisory body, more powers had been shifted to the Azad Jammu and Kashmir Legislative Assembly and the Government of Azad Jammu and Kashmir. The Kashmir Council, dominated by Pakistani federal authorities, was vested with wide-ranging powers, including the authority to appoint and dismiss judges of the superior courts in Azad Jammu and Kashmir and to appoint the Chief Election Commissioner.[275] However, the 13th amendment actually transferred the Kashmir Council's powers to the Prime Minister of Pakistan.[276]

148.   On 22 May 2018, the Government of Gilgit-Baltistan promulgated the Government of Gilgit-Baltistan Order 2018 to replace the Gilgit-Baltistan (Empowerment and Self-Governance) Order 2009. The promulgation was met with widespread protests in Gilgit-Baltistan including by mainstream political parties, pro-independence groups and civil society organizations with demands for full democratic rights and representation.[277] On 20 June 2018, the Supreme Appellate Court of Gilgit-Baltistan suspended the new order.[278] On 17 January 2019, the Supreme Court of Pakistan restored the Gilgit-Baltistan Order 2018, warned Pakistani authorities against changing the status of Gilgit-Baltistan until a referendum

---

[272] Government of Azad Jammu and Kashmir, "Azad Jammu and Kashmir Interim Constitution (Thirteenth Amendment) Act, 2018", 2 June 2018. Available from http://www.ajkassembly.gok.pk/Notification%20Pdf%2013th%20Constitutional%20Amendment%20 02-06-2018(1).pdf.

[273] "13th amendment in interim constitution will empower AJKLA: Farhat", *Radio Pakistan*, 5 July 2018. Available from http://www.radio.gov.pk/05-07-2018/13th-amendment-in-interim-constitution-will-empower-ajkla-farhat.

[274] India, Ministry of External Affairs, India protests to Pakistan against so-called "Azad Jammu and Kashmir Interim Constitution (13th Amendment) Act 2018", 11 June 2018. Available from https://mea.gov.in/press-releases.htm?dtl/29972/India+protests+to+Pakistan+against+socalled+Azad+Jammu+and+Kashmir+I nterim+Constitution+13th+Amendment+Act+2018.

[275] Austrian Centre for Country of Origin & Asylum Research and Documentation, "Pakistan-administered Kashmir (Azad Kashmir and Gilgit-Baltistan)", 7 May 2012, p. 10. Available from https://www.ecoi.net/en/file/local/1028814/90_1337596756_accord-pakistan-20120507-kashmir.pdf.

[276] "Who rules Azad Jammu and Kashmir", *The Friday Times*, 17 August 2018. Available from https://www.thefridaytimes.com/who-rules-azad-jammu-and-kashmir/.

[277] International Crisis Group (ICG), "China-Pakistan Economic Corridor: Opportunities and Risks", 29 June 2018, p. 16. Available from https://www.crisisgroup.org/asia/south-asia/pakistan/297-china-pakistan-economic-corridor-opportunities-and-risks.

[278] "Appellate court suspended 2018 order," *Dawn*, 21 June 2018. Available from https://www.dawn.com/news/1415071.

was conducted and extended its own powers over the region.[279] After the Supreme Court judgement, Pakistan's Ministry of Kashmir Affairs and Gilgit-Baltistan introduced a new document titled Gilgit-Baltistan Governance Reforms, 2019.[280] This document is identical to the Government of Gilgit-Baltistan Order 2018.

149.   Unlike Azad Jammu and Kashmir and Indian-Administered Kashmir, Gilgit-Baltistan does not have a law that reserves the right to own land only to its permanent residents.[281]

150.   Pakistan's National Commission for Human Rights does not have any jurisdiction over Azad Jammu and Kashmir, but exercises direct jurisdiction over Gilgit-Baltistan.

## B.   Restrictions on the rights to freedom of expression and association

151.   In the June 2018 report, OHCHR highlighted that the Interim Constitution of Azad Jammu and Kashmir places several restrictions on anyone criticizing the region's accession to Pakistan,[282] in contravention of Pakistan's commitments to uphold the rights to freedoms of expression and opinion, assembly and association.[283] OHCHR recommended that Pakistani and Azad Jammu and Kashmir authorities bring these laws into compliance with international human rights standards.[284] However, the amended Interim Constitution of 2018 has retained the clauses that directly contravene international human rights law. It explicitly continues to state, "[N]o person or political party in Azad Jammu and Kashmir shall be permitted to propagate against, or take part in activities prejudicial or detrimental to, the ideology of the State's accession to Pakistan."[285]

152.   Azad Jammu and Kashmir's electoral law has not been amended, and it continues to disqualify anyone running for elected office who does not sign a declaration that says, "[I] have consented to the above nomination and that I am not subject to any disqualification for being, or being elected as a member of the Legislative Assembly and in particular I solemnly declare that I believe in the Ideology of Pakistan, the Ideology of State's Accession to Pakistan and the integrity and sovereignty of Pakistan."[286]

153.   Authorities in Gilgit-Baltistan also failed to amend similar provisions in the region's governance rules that restrict the rights to freedoms of expression and opinion, assembly and association. The Government of Gilgit-Baltistan Order 2018 and the updated Gilgit-Baltistan Governance Reforms, 2019 retain the same language limiting freedom of association from the Gilgit-Baltistan Empowerment and Self-Governance Order 2009.[287] The Gilgit-Baltistan Governance Reforms, 2019 states, "[N]o person or political party in the area comprising Gilgit-Baltistan shall propagate against, or take part in activities prejudicial or detrimental to the ideology of Pakistan."[288]

154.   A prominent Pakistani NGO criticised the Government of Gilgit-Baltistan Order 2018 for failing to protect the fundamental freedoms of the people of Gilgit-Baltistan.[289] The Human Rights Commission of Pakistan (HRCP) said, "[I]n claiming to grant the people of

---

[279] "Top court's powers extended to Gilgit-Baltistan, rules Supreme Court", *Dawn*, 17 January 2019. Available from https://www.dawn.com/news/1458109.

[280] Government of Pakistan, "Gilgit-Baltistan Governance Reforms, 2019", January 2019. Available from http://www.supremecourt.gov.pk/web/user_files/File/Const.P._50_2018.pdf.

[281] G-B's state subject rule was abolished by Government of Pakistan in 1974.

[282] Article 7(2), Azad Jammu and Kashmir Interim Constitution Act, 1974.

[283] OHCHR, "Report on the situation of human rights in Kashmir", para 147.

[284] Ibid. p.49.

[285] Government of Azad Jammu and Kashmir, "Azad Jammu and Kashmir Interim Constitution (Thirteenth Amendment) Act, 2018", p.11.

[286] Government of Azad Jammu and Kashmir, "The Azad Jammu and Kashmir Legislative Assembly (Elections) Rules, 1970", p 226. Available from https://ec.gok.pk.

[287] Government of Gilgit-Baltistan, Gilgit-Baltistan (Empowerment and Self-Governance) Order 2009, Article 9(2).

[288] Government of Pakistan, "Gilgit-Baltistan Governance Reforms, 2019", p.8.

[289] Human Rights Commission of Pakistan (HRCP), "GB reforms leave its people lesser citizens", 24 May 2018. Available from http://hrcp-web.org/hrcpweb/gb-reforms-leave-its-people-lesser-citizens/.

[Gilgit-Baltistan] their fundamental freedoms, the [Gilgit-Baltistan] Order has clipped their right to freedom of association and expression. It has denied any Gilgit-Baltistani the right to become a chief judge of the Supreme Appellate Court or to have any say in internal security. Above all, it has disregarded people's needs despite continual public pressure in [Gilgit-Baltistan] to address their problems fairly and in accordance with local aspirations."[290]

155.    After the Supreme Court of Pakistan restored the Government of Gilgit-Baltistan Order 2018 in January 2019, the HRCP called on Pakistan's President to delay the enforcement of the order "pending necessary consultations with the people of Gilgit-Baltistan".[291] In a letter sent to Pakistan President Arif Alvi, the HRCP reiterated its earlier observation that "the Government of Gilgit-Baltistan Order 2018 was a step backwards as compared to the previous order issued in 2009, i.e. the Gilgit-Baltistan (Empowerment and Self-Governance) Order 2009. The democratically minded people of Gilgit-Baltistan have long been fighting for the recognition of their fundamental rights."[292]

156.    Members of nationalist and pro-independence political parties[293] claim that they regularly face threats, intimidation and even arrests for their political activities from local authorities or intelligence agencies.[294] They said often threats are also directed at their family members including children.[295] Such intense pressure has reportedly forced many to either flee Pakistan and continue their political activities in exile or stop them completely.[296]

157.    In November 2018, 19 activists of the Jammu and Kashmir Liberation Front were charged with "treason" for organising a rally in Kotli area of Azad Jammu and Kashmir.[297] Protesters raised slogans that called on India and Pakistan to demilitarize and leave Kashmir.[298] On 15 March 2019, 30 members of the Jammu Kashmir National Students Federation were arbitrarily detained by Pakistani law enforcement agencies while protesting at the Rawalpindi Press Club in Rawalpindi.[299] The Jammu Kashmir National Students Federation members were reportedly demanding Kashmiri independence from Pakistan. They were held incommunicado before being released on 20 March 2019[300] after a court intervention.[301] The Jammu Kashmir National Students Federation allege that the Pakistani authorities did not release their former president, Sardar Talah, who was also detained at the same venue on 15 March 2019 and have expressed concerns for his well-being.[302]

158.    While the 13th amendment has reportedly transferred most powers to the Azad Jammu and Kashmir Assembly, media owners in the region still have to obtain permission to publish from the Kashmir Council and the Ministry of Kashmir Affairs.[303]

159.    According to journalists working in Azad Jammu and Kashmir and Gilgit-Baltistan, media houses continue to practice self-censorship as a means of avoiding harassment from

---

[290]  HRCP, "GB reforms leave its people lesser citizens", 24 May 2018. Available from http://hrcp-web.org/hrcpweb/gb-reforms-leave-its-people-lesser-citizens/.

[291]  HRCP, "HRCP calls for delaying enforcement of new GB order", 23 January 2019. Available from http://hrcp-web.org/hrcpweb/hrcp-calls-for-delaying-enforcement-of-new-gb-order/.

[292]  Ibid.

[293]  Nationalist and pro-independence parties in Pakistan-Administered Kashmir include groups that oppose union with Pakistan and demand an independent Kashmir.

[294]  L210; P117; P107.

[295]  Ibid.

[296]  Ibid.

[297]  P117.

[298]  Ibid.

[299]  Jammu Kashmir National Students Federation (JKNSF) Twitter statement, 20 March 2019. Available from https://twitter.com/JammuNational/status/1108259423619825664; OHCHR verified the detention of around 30 JKNSF activists through two other independent sources.

[300]  P117; L210.

[301]  JKNSF Twitter statement, 20 March 2019. Available from https://twitter.com/JammuNational/status/1108265077738749952.

[302]  JKNSF Twitter statement, 20 March 2019. Available from https://twitter.com/JammuNational/status/1108296278591574017.

[303]  United States State Department, "Pakistan 2018 Human Rights Report", p. 22. Available from https://www.state.gov/documents/organization/289500.pdf.

security agencies and not losing government advertisements, which are the main source of revenue.[304] Journalists claim local administrators use the advertisement revenue as a "carrot and stick" policy with media owners in order to get favourable news published, reduce coverage of their political opponents and censor any criticism of Pakistan by political groups or civil society members.[305]

160.   Journalists in Pakistan-Administered Kashmir continue to face threats and harassment in the course of carrying out their professional duties. According to the Committee to Protect Journalists (CPJ), an anti-terrorism court in Gilgit-Baltistan sentenced journalist Shabbir Siham in absentia to 22 years in prison and fined him 500,000 Pakistani Rupees (USD 4,300) on charges of defamation, criminal intimidation, committing acts of terrorism, and absconding from court proceedings.[306] Shabbir Siham was accused of "fabrication and extorting a regional minister in violation of Pakistan's Anti-Terrorism Act, after he wrote an article for the *Daily Times* newspaper accusing legislators from Gilgit-Baltistan of involvement in human trafficking and prostitution."[307] Shabbir Siham told CPJ that he did not appear before the court due to security concerns.[308]

161.   On 21 November 2018, Gilgit-Baltistan authorities arrested journalist Muhammad Qasim Qasimi after he engaged in a verbal argument with a local police official.[309] The newspaper that he worked for reported that he may have been arrested to prevent the publication of his story on a corruption scandal in the local government.[310] According to CPJ, Qasimi has been charged with "criminal intimidation, intentional insult with intent to provoke breach of peace, defamation, threat of injury to public servant, and obstructing a public servant in discharge of public functions."[311]

162.   According to the International Crisis Group (ICG), Pakistani intelligence officials have also warned journalists in Gilgit-Baltistan against criticising the China-Pakistan Economic Corridor projects.[312]

## C.   Business and human rights

163.   Several major projects have been proposed in Gilgit-Baltistan under the China-Pakistan Economic Corridor (CPEC), which is seen as a major infrastructure development boost for the region. While CPEC has raised expectations of bringing development to an impoverished region, civil society groups say the initial optimism has been replaced by disappointment and a sense of outrage.[313]

164.   According to ICG, the people of Gilgit-Baltistan are resentful because they feel CPEC projects were "designed and implemented without their input"[314] and "will be of little benefit to them".[315] Environmental activists and local communities have also raised concerns about the ecological impact of largescale infrastructure projects.[316] Locals believe most CPEC jobs would go to outsiders from Pakistani provinces and they fear this "could also affect Gilgit-Baltistan's delicate Sunni-Shia demographic balance."[317] ICG concludes, "the state's

---

[304]   P107; J79; P117; J93.

[305]   Ibid.

[306]   CPJ, "Pakistani journalist appeals 22-year sentence on terrorism, defamation charges", 10 May 2018. Available from https://cpj.org/2018/05/pakistani-journalist-appeals-22-year-sentence-on-t.php.

[307]   Ibid.

[308]   Ibid.

[309]   CPJ Index, Muhammad Qasim Qasimi, 21 November 2018. Available from https://cpj.org/data/people/muhammad-qasim-qasimi/index.php.

[310]   Ibid.

[311]   CPJ Index, Muhammad Qasim Qasimi, 21 November 2018.

[312]   ICG, "China-Pakistan Economic Corridor: Opportunities and Risks", p. 15; R22.

[313]   ICG, "China-Pakistan Economic Corridor: Opportunities and Risks", p. 15.

[314]   Ibid.

[315]   Ibid.

[316]   Ibid.

[317]   Ibid.

response to local dissent and alienation has been an overbearing security presence, marked by army checkpoints, intimidation and harassment of local residents, and crackdowns on anti-CPEC protest."[318]

165.    The fashion in which the CPEC projects are being implemented raises issues in relation to the enjoyment of rights enshrined in the International Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights, to which Pakistan is State party.    In addition, according to the United Nations Guiding Principles on Business and Human Rights, "business enterprises have an independent responsibility to respect human rights and that in order to do so they are required to exercise human rights due diligence."[319] It defines human rights due diligence as "processes that all business enterprises should undertake to identify, prevent, mitigate and account for how they address potential and actual impacts on human rights caused by or contributed to through their own activities, or directly linked to their operations, products or services by their business relationships."[320] The first pillar of the Guiding Principles highlights the state's duty to protect against "human rights abuse within their territory and/or jurisdiction by third parties, including business enterprises."[321] This, the Guiding Principles say, requires taking appropriate steps to prevent, investigate, punish and redress such abuse through effective policies, legislation, regulations and adjudication.

166.    A key concern in both Azad Jammu and Kashmir and Gilgit-Baltistan is that the local communities do not control natural resources of the territories as these are controlled by Pakistani federal agencies.[322] Political leaders and activists feel their natural resources are exploited for the benefit of Pakistan while the people of Azad Jammu and Kashmir and Gilgit-Baltistan continue to remain largely impoverished.[323]

## D.    Impact of counter-terrorism on human rights

167.    Authorities in Gilgit-Baltistan continue to use the Anti-Terrorism Act 1997 (ATA) to target political activists, human defenders and student protesters.[324] As noted in the June 2018 OHCHR report, the ATA is a Pakistani law misused by Gilgit-Baltistan authorities especially after the introduction of Pakistan's National Action Plan for countering terrorism and extremism in December 2014. The report also indicated concerns raised by the Human Rights Committee and the Committee against Torture.[325]

168.    Prominent political activist Baba Jan and 11 other protesters who were prosecuted under ATA for their environmental activism in September 2011 are serving a prison sentence of 40 years and activists believe they have only narrow legal recourse available to challenge false charges against them.[326]

169.    Authorities in Gilgit-Baltistan frequently clamp down on any anti-CPEC dissent with the ATA and the 2016 cybercrimes law.[327] Anyone who protests or criticises CPEC is termed

[318]   ICG and World Economic Forum, "Opportunities and risks – the China-Pakistan trade corridor", 3 July 2018. Available from https://www.weforum.org/agenda/2018/07/opportunities-and-risks-the-china-pakistan-economic-corridor/.

[319]   A/73/163, Working Group on the issue of human rights and transnational corporations and other business enterprises, 16 July 2018, para 2. Available from http://ap.ohchr.org/documents/dpage_e.aspx?si=A/73/163.

[320]   Ibid.

[321]   United Nations Guiding Principles on Business and Human Rights, p. 3. Available from https://www.ohchr.org/documents/publications/GuidingprinciplesBusinesshr_eN.pdf.

[322]   P117; P107; L210; P98.

[323]   Ibid.

[324]   L210; P107; J78.

[325]   OHCHR, "Report on the situation of human rights in Kashmir", para. 156.

[326]   L210; P107; J78.

[327]   ICG, "China-Pakistan Economic Corridor: Opportunities and Risks", p. 15; R22; P107.

as "anti-national and anti-people".[328] Moreover, authorities often accuse critics of being Indian spies in order to delegitimize their concerns and protests.[329]

170.   In a joint communication to the Government of Pakistan, a group of Special Procedures mandate holders observed, "[I]t appears that ATA has effectively created a parallel system of unique and exceptional procedures from arrest to custody, detention, prosecution, and sentencing of terrorism suspects by authorizing measures such as the denial of bail, enhanced police powers, arrest without warrant, and extended remand of suspects for up to 30 days, thereby increasing the risk of torture as a means of extracting confessions in police or other law-enforcement's or security forces' custody."[330]

## E.   Restrictions on the freedom of religion or belief

171.   In the June 2018 report, OHCHR drew attention to the provision in Azad Jammu and Kashmir's Interim Constitution that, similar to Pakistan's Constitution, defines who is a real "Muslim" and uses this definition to discriminate against the minority Ahmadiyya community.[331] The amended Interim Constitution of 2018 has made no changes to this discriminatory provision.[332]

172.   Human rights lawyers and activists informed OHCHR that Pakistan's blasphemy provisions[333] continue to be in force in Azad Jammu and Kashmir and Gilgit-Baltistan.[334] These provisions have been criticized by several United Nations Treaty Bodies and Special Procedures mandate holders for violating a range of international human rights principles and emboldening instigation of violence against religious minorities.[335]

## F.   Enforced or involuntary disappearances

173.   OHCHR has received credible information of enforced disappearances of people from Pakistan-Administered Kashmir including those who were held in secret detention and those whose fate and whereabouts continue to remain unknown.[336] The people subjected to enforced or involuntary disappearances included men working with Pakistani security forces or those who were allegedly previously associated with armed groups that operate in Indian-Administered Kashmir. Some cases of alleged enforced disappearances have also been

---

[328]  R22; P107; J78.

[329]  ICG, "China-Pakistan Economic Corridor: Opportunities and Risks", p. 15.

[330]  Joint Communication, Mandates of the Working Group on Arbitrary Detention; the Special Rapporteur on extrajudicial, summary or arbitrary executions; the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism and the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment (AL PAK 6/2018), 24 October 2018, p.1. Available from https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=24140.

[331]  OHCHR, "Report on the situation of human rights in Kashmir", para 160.

[332]  Government of Pakistan, "Gilgit-Baltistan Governance Reforms, 2019".

[333]  Chapter 15 of Pakistan Penal Code deals with "offences relating to religion" provides the legal basis action against blasphemy. Section 295-C provides life sentence or the death penalty for anyone using derogatory remarks against the Holy Prophet. Section 298-B and 298-C outline the Islamic religious activities that cannot be undertaken by groups described as Ahmadiyya, Quadiani or Lahori group; Pakistan, Penal Code [Pakistan], Act No. XLV, 6 October 1860. Available from http://www.refworld.org/docid/485231942.html.

[334]  L210; P107.

[335]  Blasphemy laws violate freedom of religion and belief, freedom of expression, right to equality, right to life. A/72/365, Interim report of Special Rapporteur on freedom of religion or belief Ahmed Shaheed, 28 August 2017; A/HRC/37/49, Report of the Special Rapporteur on freedom of religion or belief Ahmed Shaheed, 28 February 2018; CCPR/C/PAK/CO/1, Human Rights Committee, Concluding Observations on the initial report of Pakistan, 23 August 2017.

[336]  H67; H49.

reported from areas close to the Line of Control that are under the control of Pakistani armed forces.[337]

174.   In almost all cases brought to OHCHR's attention, victim groups allege that Pakistani intelligence agencies were responsible for the disappearances.[338] There are fears that people subjected to enforced disappearances from Pakistan-Administered Kashmir may have been detained in any of the military-run internment centers[339] in Pakistan.[340]

175.   The Human Rights Committee has stated that although the ICCPR does not explicitly use the term "enforced disappearance" as such, enforced disappearance constitutes a unique and integrated series of acts that represent continuing violation of various rights recognized in the Covenant, including right to life and the prohibition of torture or cruel, inhuman or degrading treatment or punishment.[341]

176.   In April 2017, the Committee against Torture expressed concern at "very broad powers given to the Army to detain people suspected of involvement in terrorist activities without charge or judicial supervision in internment centres under the Actions (in Aid of Civil Power) Regulation, 2011 (arts. 2 and 15)."[342] It recommended Pakistan "[r]epeal or amend the Actions (in Aid of Civil Power) Regulation, 2011 in order to remove the power of the military to establish internment centres" and "ensure that no one is held in secret or incommunicado detention anywhere in the territory of the State party, as detaining individuals in such conditions constitutes per se a violation of the Convention."[343]

177.   The Human Rights Committee has also expressed these internment centres and the "allegedly high number of persons held in secret detention under the Regulation (Actions (in Aid of Civil Power) Regulation, 2011)".[344] The Committee welcomed the establishment of Pakistan's Commission of Inquiry on Enforced Disappearances and expressed concerns about "the insufficient power and resources allocated to the Commission; the non-compliance with the Commission's orders by the relevant authorities; and the high number of cases brought before the Commission that remain unresolved, with no criminal proceedings brought against perpetrators (arts. 2, 6, 7, 9, 14 and 16)."[345]

178.   In May 2018, the Government of Pakistan advised the Supreme Court of Pakistan that 1,330 people were being held in various internment camps and that it required more time to furnish the Court with details of the legal proceedings against them.[346]

179.   OHCHR has been informed that there are likely several other cases of enforced or involuntary disappearances in Pakistan-Administered Kashmir but they do not get reported like in rest of Pakistan due to the lack of independent media or independent human rights groups working in these areas.[347]

---

[337]   P117; L210.

[338]   H67; H49; P117.

[339]   According to Amnesty International, in Pakistan an internment center is "any acknowledged detention centre administered under the Actions (in Aid of Civil Power) Regulations 2011 (AACPR) where it is defined as 'any compound, house, building, facility or any temporary or permanent structure that is notified by the Provincial Government to serve as premises where persons are interned'." (See Amnesty International, "The Hands of Cruelty: Abuses by Armed Forces and Taliban in Pakistan's Tribal Areas", 2012, p.6. Available from https://www.amnesty.nl/content/uploads/2016/11/p4026_end_impunity_in_tribal_areas.pdf)

[340]   H67.

[341]   See, for instance, Human Rights Committee's Views concerning Communication No. 2164/2012, Sabita Basnet v. Nepal, para. 10.4, and General Comment No. 36, para 58.

[342]   CAT/C/PAK/CO/1 para 12.

[343]   Ibid, para 13(c).

[344]   CCPR/C/PAK/CO/1, para 19.

[345]   Ibid.

[346]   "1,330 people sent to internment centers, SC told", *Dawn*, 3 May 2018. Available from https://www.dawn.com/news/1405306.

[347]   H67.

180.   The United Nations Working Group on Enforced or Involuntary Disappearances has received at least one case of a Pakistani national disappeared from Azad Jammu and Kashmir and a permanent resident of Gilgit-Baltistan disappeared from Pakistan.

# VIII.   Conclusions and recommendations

**181.   This report highlights serious human rights violations and patterns of impunity in Indian-Administered Kashmir and significant human rights concerns witnessed in Pakistan-Administered Kashmir. As stated in OHCHR's June 2018 report, there remains an urgent need to address past and ongoing human rights violations and to deliver justice for all people in Kashmir.**

**182.   Political tensions between India and Pakistan over Kashmir often result in the increase of ceasefire violations along the Line of Control, including shelling and firing. Ceasefire infringements in 2018 and 2019 resulted in the killing of civilians, destruction of civilian property and displacement of people in both Indian-Administered Kashmir and Pakistan-Administered Kashmir.[348]**

**183.   As neither the Governments of India nor of Pakistan have taken clear steps to address and implement the recommendations made in OHCHR's June 2018 report, those recommendations are reiterated and restated in this report.   Additional recommendations are also addressed to the respective authorities for their consideration.**

OHCHR recommends:

To the Human Rights Council:

Consider the findings of this report, including the possible establishment of a commission of inquiry to conduct a comprehensive independent international investigation into allegations of human rights violations in Kashmir.

To the authorities in India:

(a)   Fully respect India's international human rights law obligations in Indian-Administered Kashmir,

(b)   Urgently repeal the Armed Forces (Jammu and Kashmir) Special Powers Act, 1990; and, in the meantime, immediately remove the requirement for prior central government permission to prosecute security forces personnel accused of human rights violations in civilian courts;

(c)   Establish independent, impartial and credible investigations to probe all civilian killings which have occurred since July 2016, as well as obstruction of medical services during the 2016 unrest, arson attacks against schools and incidents of excessive use of force by security forces including serious injuries caused by the use of the pellet-firing shotguns;

(d)   Investigate all deaths that have occurred in the context of security operations in Jammu and Kashmir following the guidelines laid down by the Supreme Court of India;

(e)   Investigate all cases of abuses committed by armed groups in Jammu and Kashmir, including the killings of minority Kashmiri Hindus since the late 1980s;

(f)   Provide reparations and rehabilitation to all individuals injured and the family of those killed in the context of security operations;

(g)   Investigate and prosecute all cases of sexual violence allegedly perpetrated by state and non-state actors, and provide reparations to victims;

---

[348] According to Pakistan's Ministry of Foreign Affairs, 35 civilians were killed and 135 injured in 2018 [on Pakistan's side of the Line of Control]." (Pakistan, Ministry of Foreign Affairs, Press Release, 3 November 2018. Available from http://mofa.gov.pk/pr-details.php).

(h)     Bring into compliance with international human rights standards all Indian laws and standard operating procedures relating to the use of force by law enforcement and security entities, particularly the use of firearms: immediately order the end of the use of pellet-firing shotguns in Jammu and Kashmir for the purpose of crowd control;

(i)     Amend the Jammu and Kashmir Public Safety Act, 1978 to ensure its compliance with international human rights law;

(j)     Release or, if appropriate, charge under applicable criminal offences all those held under administrative detention and ensure the full respect of standards of due process and fair trial guaranteed under International law;

(k)     Treat any person below the age of 18 who is arrested in a manner consistent with the Convention on the Rights of the Child;

(l)     Investigate all blanket bans or restrictions on access to the Internet and mobile telephone networks that were imposed in 2016, and ensure that such restrictions are not imposed in the future;

(m)     End restrictions on the movement of journalists and arbitrary bans of the publication of newspapers in Jammu and Kashmir.

(n)     Ensure independent, impartial and credible investigations into all unmarked graves in the state of Jammu and Kashmir as directed by the State Human Rights Commission; if necessary, seek assistance from the Government of India and /or the international community. Expand the competence of the Jammu and Kashmir State Human Rights Commission to investigate all human rights violations and abuses in the state, including those allegedly committed by central security forces;

(o)     Ensure people from Kashmir are not targeted or legally harassed in other parts of India on the basis of their actual or presumed identity;

(p)     Ratify the International Convention for the Protection of all Persons from Enforced Disappearance, the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and its Optional Protocol,

(q)     Introduce enabling domestic laws as recommended during India's UPR in 2008, 2012 and 2017;

(r)     In line with its standing invitation to the Special Procedures, accept the invitation requests of the almost 20 mandates that have made such requests; in particular, accept the request of the Working Group on Enforced or Involuntary Disappearances and facilitate its visit to India, including to Jammu and Kashmir; and

(s)     Fully respect the right of self-determination of the people of Kashmir as protected under international law.

To the Government of Pakistan:

(a)     Fully respect international human rights law obligations in Pakistan-Administered Kashmir;

(b)     End the misuse of anti-terror legislation to persecute those engaging in peaceful political and civil activities and expressions of dissent, and amend the Anti-Terrorism Act to bring it in line with international human rights standards, including by incorporating human rights safeguards;

(c)     Federal and local authorities should amend sections of the Interim Constitution of Azad Jammu Kashmir and other relevant legislation that limit the rights to freedoms of expression and opinion, and peaceful assembly and association;

(d)     Immediately release from prison or house arrest any political activists, journalists and other civil society actors who have been convicted for peacefully expressing their opinions;

(e)     Federal and local authorities should amend the constitutions of Azad Jammu and Kashmir and Gilgit-Baltistan to end the criminalization of the Ahmadiyya Muslims and to allow to them to freely and safely exercise their freedom of religion or belief;

(f)     Abolish blasphemy provisions in Azad Jammu Kashmir and Gilgit-Baltistan to facilitate the enjoyment of freedom of religion and belief by all people;

(g)     Ensure indigenous and local communities of Azad Jammu and Kashmir and Gilgit-Baltistan are consulted and give their informed consent for the use of their land or natural resources for any kind of non-local business activities;

(h)     Ratify the International Convention for the Protection of all Persons from Enforced Disappearance, and its Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,

(i)     Criminalize enforced disappearances in the penal code and reinforce the capacities of the Pakistanis Inquiry Commission on Enforced Disappearances as Pakistan had accepted in its UPR in 2013; and

(j)     Fully respect the right of self-determination of the people of Kashmir as protected under international law.

## IV.    Annex:  Responses from concerned Member States

184.    OHCHR shared the draft report with the Governments of India and of Pakistan on 12 June 2019 with a request to provide any factual comments by 17 June.

185.    India did not make any request for or suggest any specific factual corrections to the content of the report nor did it address any of the allegations contained in it. However, it rejected the report on the basis it was "fallacious, tendentious and [politically] motivated" – similar to its rejection of the first report on Kashmir issued in June 2018. India stated that the report should focus on "cross-border terrorism" which it claimed was at the "heart of the issue" claiming that OHCHR had overlooked this issue in the report. It added that the report had ignored its "sustained and comprehensive socio-economic development efforts". India requested OHCHR not to publish the report.

186.    Pakistan welcomed the report and provided "factual" comments which were considered by OHCHR on the basis of merit. Many were requests for the removal or amendment of sections of the report pertaining to Pakistan-Administered Kashmir on the grounds that the information was not specific to Pakistan-Administered Kashmir but were general human rights concerns affecting all of Pakistan. Pakistan also requested OHCHR to include what is essentially political analysis and the historical background that was contained in the first report.